No. 65,704

NORMAN KUHL and BILLY D. VAN AKEN, *Appellees,* v. ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, a corporation; WILLA WRIGHT; and GREEN COUNTRY INN OF MERRIAM, L.P., a Kansas Limited Partnership, as owner of Oak Tree Inn, *Appellants,* and JUAN REYES and CURTIS CANSECO, *Appellees.*

(827 P.2d 1)

filed February 28, 1992.

*Bradley S. Russell,* of Wallace, Saunders, Austin, Brown & Enochs, Chartered, of Overland Park, argued the cause, and *Michael J. Dutton,* of the same firm, was with him on the brief for appellants Willa Wright and Green Country Inn.

*William P. Coates, Jr.,* of McAnany, Van Cleave & Phillips, P.A., of Lenexa, argued the cause, and *Douglas M. Greenwald,* of the same firm, was with him on the brief for appellant Atchison, Topeka & Santa Fe Railway Company.

*Jon G. Carlson,* of Jon G. Carlson & Associates, P.C., of Edwardsville, Illinois, argued the cause, and *Davy C. Walker,* of Kansas City, was with him on the brief for appellees Norman Kuhl and Billy D. Van Aken.

*Susan S. Baker,* of Payne & Jones, Chartered, of Overland Park, was on the brief for appellee Juan Reyes.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is a personal injury action arising out of a motor vehicle accident. The plaintiffs Norman Kuhl and Billy D. Van Aken were employees of the defendant, Atchison, Topeka & Santa Fe Railway Company (ATSF). Defendant Willa Wright was employed at the Oak Tree Inn, a motel owned by defendant Green Country Inn, and she was driving Kuhl and Van Aken to work when the motel's van was struck from behind by a car driven by defendant Juan Reyes and owned by defendant Curtis Canseco. The jury attributed 68% of the fault to ATSF, Wright, and Green Country Inn collectively, 22% to Reyes, and 10% to Canseco. The jury awarded the medical expenses incurred by each plaintiff, and the awards for pain, disability, and economic loss were identical. ATSF appealed the jury's awards of identical damages to the plaintiffs. Green Country Inn and Wright appealed, asserting three issues: the jury instructions, the award of damages, and the district court's failure to direct a verdict in their favor. The Court of Appeals, in an unpublished opinion filed August 23, 1991, found no error as to the instructions, but reversed the jury's award of damages and remanded the case for a new trial on that issue. Wright and Green Country Inn sought review of the Court of Appeals' decision as to the jury instructions,

and plaintiffs sought review as to the reversal of the jury's award of damages. We granted both petitions for review.

Wright, who was employed at the Oak Tree Inn to drive railroad employees who stayed at the motel, drove Kuhl and Van Aken in a van from the Oak Tree Inn to the ATSF yards. When she stopped to make a left turn into the yards, a car driven by Reyes struck the rear of the van.

Those witnesses who were asked how long the van was stopped waiting to turn left gave widely varying answers. Jennifer Fountain, a teenaged pedestrian who witnessed the accident, estimated that the van was stopped for three seconds before it was struck. Wright said she did not know how long she was stopped before the accident occurred and could not estimate the time. She did remember, however, that several oncoming cars passed her before the van was hit. At trial Van Aken testified that he did not know exactly how long the van was stopped, but that the stop and the screeching of tires and the impact all occurred in a matter of seconds. In his deposition, Van Aken said that the van was stopped for 15 seconds or less. He remembered that there were several oncoming cars. Kuhl gave a statement to an insurance adjuster in which he said that the van was stopped between 30 and 45 seconds, and in his deposition he said approximately 30 seconds. At trial he testified that he had never been able to do more than roughly estimate how long they were stopped because he was not paying attention and "how seconds tick off I have no idea."

The evidence is sharply conflicting on the question of how quickly Wright stopped the van. Jennifer Fountain used the phrase, "slammed on her brakes." Wright testified that she stopped the van in a normal fashion. Reyes several times said that Wright "slammed on her brakes," but added that the van did not slide. He also testified, however, that she did not slam on her brakes. He testified that her stop was "sudden," but not so sudden as to cause the front end of the van to dip. Mark Walker, a passenger in the car driven by Reyes, described the stopping of the van as "real abrupt" and "real sudden."

With regard to whether Wright signaled her intention to turn left, Wright is the only person who testified that she signaled before the van was hit. She said that the blinker was on before

she came to a stop. Jennifer Fountain said that the turn signal was not on before the accident. She also testified that, after the accident and after Wright surveyed the back of the van for damage, Wright went back into the van in order to activate the signal. Then Fountain heard Wright say she had it on. Reyes testified that Wright did not signal. Walker testified that Wright did not signal. Kuhl and Van Aken testified that immediately after the impact, Wright repeated over and over that she had turned on the turn signal.

It was daylight when the accident occurred. There is no indication that there were any adverse weather conditions in effect.

Juan Reyes was 15 years old at the time of the accident. He had neither a driver's license nor a learner's permit. Curtis Canseco was his friend, and Canseco had asked Reyes to take the car and run an errand for him. Reyes estimated that he was driving 25 m.p.h. The police report set his travel speed between 27 and 32 m.p.h. When Reyes first noticed the van, it was one car length away, and he saw the van's brake lights come on. The van was stopped when he hit it.

After the accident Van Aken walked from the van into the rail yard and rode the train back to Iowa. He had a mild headache, his neck hurt, and there were some warm sensations in his neck. The next day he was "really sore." He did not work for approximately two weeks. After that he had neck discomfort and severe headaches which caused him to miss some work. He slipped on some oil and fell in May 1988. Riding trains "really bothered" him, and he never got better. In December 1988 his doctor suggested a lighter form of work. Van Aken testified that he continues to be stiff and cannot turn his head quickly. He continues to remain physically active, but has tailored his exercises to his condition. He belongs to a health club where he rides an exercise bicycle with moving handle bars and lifts 50 to 60 pounds while lying on a bench; he jogs three miles twice a week and rides a mountain bike, but he no longer plays golf.

Van Aken was 38 at the time of trial. He had worked for ATSF for 16 years. His earnings as a brakeman with ATSF during the year 1987 were $27,911. He continued to work in his position until December 1988, approximately 10 months after the accident, when his doctor suggested that he find a lighter form of work.

ATSF was reducing its work force and offering buyouts to brakemen at that time. Van Aken voluntarily left his job with ATSF and took a $37,000 buyout payment. Six months later he moved to Florida and began employment with a real estate agency selling residential property. During the last six months of 1989, he earned $480. In the first four months of 1990, before trial began in May 1990, he earned between $2,000 and $3,000, and he believed that his income would continue to increase as his clientele developed. Van Aken's expert economist calculated his lost income at $424,000 to $483,000—the lower figure being based on retirement at age 62 and the higher at 66.

Kuhl also walked away from the accident and rode the train back to Iowa as scheduled, but he began experiencing tightened back muscles and a headache before reaching his destination. He never was hospitalized for injuries suffered in this accident. Kuhl described his problem as "[m]ainly terrific headaches around the skull. Start here behind the skull down this big leader, that muscle right there, that was my main problem. Still today that is a very tender place." He testified that the lateral movement of the train significantly aggravated the problem. He continued to make train trips during March 1988 using a muscle relaxant, aspirin, and a cervical collar. At the end of a trip he would lay on a hot pack until he was called for the next run. Kuhl has given up activities such as carpentry, electrical and cement work, and demolition and remodeling of houses, which he had engaged in before the accident. Driving bothers him, and he does not sleep through the night due to pain.

Kuhl was 63 at the time of trial. He worked for ATSF from 1951 to 1960 and from 1966 to 1988. He had worked as a switchman, brakeman, and conductor. Kuhl and his wife had 11 children, including 9 from prior marriages; the two youngest were 12 and 15 at the time of trial. Kuhl could have worked for the railroad until he was 70, and he intended to work until his youngest child was through school. The following salary figures were given for Kuhl: 1983—$46,389; 1985—$46,827; 1986—$43,702; 1987—$45,869. In 1988, the year of the accident, he earned $22,008. He retired October 1, 1988. Kuhl testified that he quit at the suggestion of Dr. Asher.

We first consider if the district court erred in instructing the jury. A recent statement of the standard for appellate review of alleged errors in jury instructions was given in *Leiker v. Gafford*, 245 Kan. 325, Syl. ¶ 1, 778 P.2d 823 (1989):

"Errors regarding jury instructions will not demand reversal unless they result in prejudice to the appealing party. Instructions in any particular action are to be considered together and read as a whole, and where they fairly instruct the jury on the law governing the case, error in an isolated instruction may be disregarded as harmless. If the instructions are substantially correct, and the jury could not reasonably be misled by them, the instructions will be approved on appeal."

Willa Wright and Green Country Inn complain that the district court gave the following instructions to the jury: PIK Civ. 2d 8.03B, 8.26, and 8.25(a) and (b). PIK Civ. 2d 8.03B states as follows: "The driver of a vehicle has a duty to keep a lookout to the rear only if the movement of his vehicle may affect the operation of a vehicle to the rear."

Wright and Green Country Inn rely on *Jones v. Spencer*, 220 Kan. 445, 553 P.2d 300 (1976), and *Hallett v. Stone*, 216 Kan. 568, 534 P.2d 232 (1975). They describe *Hallett* as "involv[ing] a rear end accident that occurred when the plaintiff was required to quickly stop to avoid striking a motor vehicle in front of her which made an abrupt left turn. The plaintiff's vehicle stopped and then was rear ended by defendant's vehicle." In holding that PIK Civ. 2d 8.03B had no support in the evidence and therefore was improperly given, this court said:

"The plaintiff did not execute the type of maneuver under which the duty arises. There is absolutely nothing in the evidence to indicate the plaintiff had any opportunity to look to the rear. Neither does the evidence suggest that the exercise of due care required such lookout. The plaintiff was forced to stop because of an illegal left turn by the driver in front of her. She could not turn aside to avoid the collision because of a high curb, and she had her vehicle under such control as to stop it within the range of her vision to avoid striking such vehicle." *Hallett*, 216 Kan. at 572.

There are several significant ways in which *Hallett* differs from the present case. Wright was not forced to stop because of any unlawful maneuver being performed by a vehicle in front of her. The evidence is that she stopped for oncoming traffic before making a left turn into the rail yard. Several witnesses testified that Wright stopped suddenly and that she slammed on the

brakes, although Wright testified that her stop was normal. There is no evidence that there was anything which would have kept Wright from moving forward to avoid the collision.

Hallett's conduct with regard to keeping a lookout to the rear could not have been a proximate cause of her accident. In the circumstances of *Hallett*, therefore, the court's giving of PIK Civ. 2d 8.03B was prejudicial to Hallett. There was evidence in the present case from which the jury could find that Wright's conduct with regard to keeping a lookout to the rear was a proximate cause of the accident in this case.

In *Jones*, the plaintiff's vehicle had been stopped at a highway intersection for several minutes while he waited for oncoming traffic to clear so that he could make a left turn. Jones testified that his turn signal was on and his brake lights were on until immediately before the collision, when he moved his foot toward the accelerator. A pickup with a camper came up rapidly behind Jones, swerved into the ditch to the right of Jones' vehicle, and turned over. Spencer, the driver of the car behind the pickup, did not see Jones until after the truck had swerved off the road. Spencer's car struck the rear of Jones' car, and the two remained locked together until they came to rest in a field 100 yards away. There were no skid marks on the highway.

This court said in *Jones*: "Our situation appears to be analogous to that in *Hallett* even though plaintiff here was contemplating a left turn. That movement was never made. The collision occurred while plaintiff was lawfully stopped preliminary to the left turn . . . ." 220 Kan. at 451. The rule as to when a duty to keep a lookout to the rear exists was recited in *Hallett* and in *Jones*:

"A motorist does not have the duty, under all circumstances, to keep a lookout to the rear, since he is entitled to rely on the exercise of ordinary care by those approaching from the rear. He may be required to maintain a lookout for a vehicle approaching from the rear when the presence of such vehicle is known, or if he is intending to change his course." 220 Kan. 445, Syl. ¶ 2; 216 Kan. 568, Syl. ¶ 1.

On this point the Court of Appeals, in the present case, stated the following:

"We believe *Hallett* and *Jones* are both factually distinguishable from the case at hand. As a result, we hold they are not controlling.

"The facts of this accident are sharply conflicting. The evidence conflicts on how long Wright was stopped, whether she stopped abruptly, and whether she signaled her stop. There is evidence from which the jury could have concluded that Wright had only been stopped for three seconds prior to the collision and that she slammed on her brakes and made an abrupt stop."

The rule stated in *Hallett* and *Jones*, that a driver may be required to maintain a lookout to the rear when he or she is intending to change course, could apply in the present case, depending on how the jury resolved the factual questions. In this respect it is distinguishable from *Jones*, which it most closely resembles. In *Jones* it was uncontroverted that plaintiff had been lawfully stopped for several minutes waiting for oncoming traffic to clear so that he could make a left turn. Jones could have gone straight rather than turning. Wright could have done the same thing. Neither Wright nor Jones was "limited to a single course of action as was the driver in *Hallett*." The critical distinction is that Jones' conduct was entirely lawful and his stop was made long before vehicles pulled up behind him, while Wright's stop may have been sudden and made with other vehicles following her.

PIK Civ. 2d 8.25(a) and (b) relate to the duty of a driver to signal his or her intention to turn or stop. PIK Civ. 2d 8.26 describes means of signaling. Wright and Green Country Inn contend that the facts and language of *Hallett* and *Jones* establish that it was error to give these instructions in the present case. The Court of Appeals concluded that neither *Hallett* nor *Jones* applies. It further concluded that the duty to signal an intention to stop or turn is mandated by statute. Therefore, the reasoning continues, if neglect of the duty "was a factor in the accident, then the giving of such instructions is proper." We agree.

The statutes referred to by the Court of Appeals are K.S.A. 8-1548, 8-1549, and 8-1550. The duties imposed by these statutes for signaling the intention to turn or stop in an "appropriate" way and "when there is opportunity to give such signal" were described to the jury following this prefatory instruction:

"As standards of ordinary care certain duties are imposed by law. They apply to persons who use the streets and highways. It is for you to decide from the evidence whether or not any of the following duties apply in this case and whether or not any have been violated. The violation of a duty is negligence." PIK Civ. 2d 8.01.

Among the duties set out in subsequent instructions are keeping one's vehicle under control, keeping a proper lookout, driving at a reasonable speed, following another vehicle at a reasonable distance, and giving an appropriate signal.

Neither *Hallett* nor *Jones* stands for the proposition that instructions as to the giving of an appropriate signal should not be given in the present case. In fact, it can be inferred that the jury was instructed as to the duty to signal in *Jones*. Examining the sufficiency of the evidence, this court stated: "The jury exonerated [the plaintiff] from a charge of failure to give an adequate signal and he must be deemed to have given that prescribed by statute." 220 Kan. at 450. In *Hallett* it was said that PIK Civ. 2d 8.26 should not have been given because Hallett's failure to signal could not have been a proximate cause of the collision. 216 Kan. at 576. The court's determination that a signal would not have prevented Stone from running into the rear of Hallett's car is based on Stone's admission that she was paying no attention to the car in front of her and that the last time she noticed Hallett's car it was a half block ahead of her and moving about 30 m.p.h.

Wright and Green Country Inn argue that the accident in the present case "would have occurred regardless of whether or not defendant Wright gave a signal of her intention to stop or turn." They contend that Reyes had the same notice that a signal would have provided because he observed the van suddenly decrease its speed, he saw the van's brake lights, and the van was stopped when he hit it. They offer no explanation why a turn signal given before Wright reached the intersection would not have provided Reyes with notice in advance of her stop and in addition to it. Nor do they take into consideration reaction time for Reyes or that there were varying versions of the sequence and timing of the events. In the circumstances of this case, there was a factual question whether the accident would have occurred if Wright had signaled her intention to turn or stop.

Wright and Green Country Inn next complain that the district court failed to submit their requested instruction PIK Civ. 2d 8.28 to the jury. PIK Civ. 2d 8.28 states the following:

"The laws of Kansas provide that the driver of a vehicle intending to turn to the left within an intersection or into an alley, private road or driveway shall yield the right-of-way to any vehicle approaching from the opposite direction which is within the intersection or so close thereto as to constitute an immediate hazard."

No authorities are cited for defendants' position. They say only that where the jury was informed of other driving duties, it was prejudicial and confusing to the jury not to explain that Wright had a right and a legal responsibility to yield to oncoming traffic.

The Court of Appeals decided that the failure to give PIK Civ. 2d 8.28 was not a ground for reversal because "the question of why Wright brought her vehicle to a stop was never an issue in the case. We cannot imagine that the jury could have reached a conclusion that Wright was somehow required by law to turn her vehicle in front of oncoming traffic." We agree. Wright's failure to yield the right-of-way to oncoming traffic is not an issue. The issue with regard to her conduct was how she made the stop and not that she made it. There is no error in the district court's refusing to submit PIK Civ. 2d 8.28 to the jury.

Wright and Green Country Inn next contend that the district court should have granted their motion for directed verdict "regarding the specific allegations of fault concerning lookout to the rear, left turn and stop." They argue that Kansas law does not impose a duty on a motorist in Wright's circumstances to keep a lookout to the rear. We rejected this argument in our previous discussion of PIK Civ. 2d 8.03B.

Wright and Green Country Inn also argue, relying primarily on *Curtiss v. Fahle*, 157 Kan. 226, 139 P.2d 827 (1943), that the failure to signal the intention to turn is not the proximate cause of a rear-end collision when the following driver observed the decrease in speed. The signal at issue in *Curtiss* was a signal of intention to stop or significantly decrease speed. Curtiss was a passenger in a car which hit the rear of a truck owned by Fahle. Curtiss' petition charged that Fahle's driver was negligent in suddenly decreasing the speed of his vehicle "without first giving notice of his intention to do so." 157 Kan. at 233. The court disagreed:

"[Curtiss] and the driver of the car in which [Curtiss] was riding both concede they observed not only the truck but also its sudden decrease in

speed without any signal of decrease in speed having been given. This they observed when 150 feet behind the truck. They therefore had the same notice as an arm or mechanical signal would have imported if given at that time." 157 Kan. at 237.

Unlike *Curtiss*, there are no admissions in the present case by the following driver or his passenger that they actually observed the van's sudden decrease in speed 150 feet to the rear. When appellate review is sought on a motion for directed verdict, "the court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought and where reasonable minds could reach different conclusions based on the evidence," the trial court's denial of the motion must be affirmed. See *Holley v. Allen Drilling Co.*, 241 Kan. 707, Syl. ¶ 1, 740 P.2d 1077 (1987). Resolving all facts and inferences against Wright and Green Country Inn requires this court to conclude, based on the evidence, that Wright failed to signal her intention to turn, she failed to signal her intention to stop, she slammed on her brakes, and Reyes was unable to react in time to avoid hitting the rear of the van. We find no abuse of discretion in the district court's denying the motion for directed verdict.

We next consider if the jury's award of identical damages for pain, disability, and economic loss to the two plaintiffs requires reversal of the award and remand for a new trial on the issue of damages. In *Morris v. Francisco*, 238 Kan. 71, 77-79, 708 P.2d 498 (1985), this court discussed the differing standards of review for damage awards. There it was stated:

"In reviewing awards for pain, suffering and other subjective elements of damage, the following standard as iterated in *Ratterree v. Bartlett*, 238 Kan. 11, 707 P.2d 1063 (1985) applies:

'Pain and suffering have no known dimensions, mathematical or financial. There is no exact relationship between money and physical or mental injury or suffering, and the various factors involved are not capable of proof in dollars and cents. For this very practical reason the only standard for evaluation is such amount as reasonable persons estimate to be fair compensation for the injuries suffered, and the law has entrusted the administration of this criterion to the impartial conscience and judgment of jurors, who may be expected to act reasonably, intelligently and in harmony with the evidence.

"Such awards are overturned only if the collective conscience of the appellate court is shocked. *Merando v. A.T. & S.F. Rly. Co.*, 232 Kan. 404, 656 P.2d 154 (1982).

"Awards for objective elements of damage, such as loss of past and future income, are subject to a different standard of appellate review as they are grounded in mathematical calculation.

. . . .

"In reviewing an award for an objective element of damages such as loss of past and future income, an appellate court must look to the record to see if there is evidence to support the jury's calculation of pecuniary loss."

In *Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.*, 249 Kan. 348, 381, 819 P.2d 587 (1991), we said:

"Ordinarily, the assessment of damages in a personal injury action is exclusively the province of the jury. *Germann v. Blatchford*, 246 Kan. 532, 537, 792 P.2d 1059 (1990).

"When a verdict is attacked on the ground that it is contrary to the evidence, this court does not reweigh the evidence. If the evidence with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the successful party below, will support the verdict, we should affirm. *Tice v. Ebeling*, 238 Kan. 704, 708, 715 P.2d 397 (1986)."

In addition to their medical expenses, Kuhl and Van Aken each was awarded the following:

| | |
|---|---|
| Pain and suffering | $42,500.00 |
| Disability | $42,500.00 |
| Other economic losses | $221,000.00 |

The Court of Appeals noted substantial differences in the individual profiles of the two plaintiffs. It concluded that the identical damage awards are not compatible with the differences. The problem was identified as the jury's failure to follow instructions:

"We hold that the identical verdicts for economic and non-economic losses in this case indicate that the jury failed in its requirement to evaluate each plaintiff's damages independently, based on their ages, the nature and extent of their injuries, and their conditions of health before and after the accident. The jury was instructed to evaluate the damages in this manner, and our conclusion from the verdict is that it failed to do so."

Stating that it found it impossible to reconcile the identical awards with the evidence, the Court of Appeals held that the "identical verdicts for economic and non-economic losses" demonstrated that the jury failed to follow the instruction to evaluate each plaintiff's damages independently. The Court of Appeals did not analyze the subjective elements separately from the objective elements of damages.

We first consider the award for non-economic damages. The verdict form and PIK Civ. 2d 9.01, Elements of Personal Injury Damage, make clear that the element of disability is categorized along with pain and suffering as non-economic/subjective. Thus, the jury's awards for disability and pain and suffering may be overturned only if the collective conscience of the appellate court is shocked. *Morris v. Francisco*, 238 Kan. at 78. Moreover, this court must review the evidence in the light most favorable to Kuhl and Van Aken, who prevailed at trial. *Ratterree v. Bartlett*, 238 Kan. 11, 22, 707 P.2d 1063 (1985) (quoting *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, Syl. ¶ 1, 681 P.2d 1038, *cert. denied* 469 U.S. 965 [1984]).

The "*only* standard for evaluation is such *amount* as reasonable persons estimate to be fair compensation for the injuries suffered." (Emphasis added.) *Morris v. Francisco*, 238 Kan. at 77-78 (quoting *Ratterree v. Bartlett*, 238 Kan. at 23). There is no per se rule which discredits identical awards, and there is no provision in current law for comparison of one plaintiff's recovery with another's to serve as the basis for overturning a jury's verdict. Thus, under current law, if the question whether reasonable persons could estimate $85,000 to be fair compensation for the injuries suffered by Kuhl as well as for the injuries suffered by Van Aken can be answered "yes," the non-economic damages awards should be upheld.

Plaintiffs presented the following evidence as to their injuries:

Van Aken was injured when he was thrown forward by the force of the impact of Canseco's car striking the rear of the van in which he was riding. He was able to walk away from the collision and ride the train to Fort Madison, Iowa. The headache and neck discomfort which were apparent immediately after the accident worsened with the train ride. In the months following the accident (in March 1988), he missed work due to neck discomfort and severe headaches. After about nine months, his doctor suggested that he find a lighter form of work. Dr. Bernard Abrams, a neurologist, testified that Van Aken, who had visited him in October or November 1988, had "scapulocostal syndrome" marked by "irritation, inflammation, chronic weakness and discomfort about the shoulder blades" and involving "limitation to the neck." During a return visit in December 1988, there was

improvement in Van Aken's headache. He had "tenderness throughout the neck," though, despite his taking medicines to reduce pain and inflammation. Van Aken told Dr. Abrams that his pain, which had been rated as 10 on a scale of 1 to 10 on the first visit, had been reduced to a 6½. When Van Aken saw Dr. Abrams in May 1990, he continued to have pain and limited range of motion in his neck. Dr. Abrams described Van Aken's condition as "chronic neck and shoulder pain."

Kuhl was injured when he was thrown forward by the force of the impact of Canseco's car striking the rear of the van in which he was riding. He was able to walk away from the collision and ride the train to Fort Madison, Iowa. The headache and neck discomfort which were apparent immediately after the accident worsened with the train ride. He described severe headaches and muscle pain in his neck. He worked off and on during the two months following the accident, and then he officially retired in October 1988. Dr. Abrams diagnosed Kuhl as having chronic neck strain and scapulo-costal syndrome. Dr. Abrams described the condition as permanent. When Kuhl first visited Dr. Abrams in October 1988, he described pain in his left shoulder blade, diminished motion of the neck, and pain in the left neck region, which radiated to the left eye. Dr. Abrams found tenderness in Kuhl's neck and back muscles. Kuhl took medicines for pain and inflammation. At two later visits, August 1989 and March 1990, Kuhl's condition remained essentially the same.

We conclude that the record supports this element of the damages and reasonable persons could estimate $85,000 to be fair compensation for the injuries suffered by Van Aken. The same can be said for Kuhl. Moreover, these amounts do not shock the collective conscience of this court.

We next turn to the economic damages. According to *Morris v. Francisco*, in reviewing the awards for economic losses, this court must examine the evidence to see whether there is support for the jury's computation. 238 Kan. at 79. Evidence with regard to the plaintiffs' economic damages is as follows:

Van Aken was 38 at the time of trial. His railroad earnings in 1987 were $27,911. He was paid $37,000 when he left the railroad. For the first six months while he was selling residential real estate he earned $480. In the first four months of the next year he earned

between $2,000 and $3,000. He anticipated that his income would continue to increase as he became established in his new profession. An economist testified that Van Aken's lost income would be between $424,000 and $483,000, depending whether he retired at age 62 or later.

Kuhl was 63 at the time of trial. His railroad earnings in 1987 were $45,869. He retired in October 1988, although his youngest child was only 10 and he had intended to work for the railroad until the youngest child was through school. Railroad policy would have allowed him to work until the age of 70.

The Court of Appeals stated with regard to this evidence:

"We find that we cannot ignore the fact that these two plaintiffs were individuals of different ages, different wage history, different employment futures, and different physical and mental health conditions."

The plaintiffs are different from one another in all the ways mentioned by the Court of Appeals. It is possible, however, to find support in the evidence for at least the amount awarded by the jury to each plaintiff. The plaintiffs do not complain that the awards are inadequate. If Kuhl had continued to work for the railroad for eight more years at his 1987 earnings level, his additional earnings would have been $366,952. Van Aken's economist calculated that Van Aken's lost earnings would have been between $424,000 and $483,000. If his $37,000 buyout payment is subtracted from $424,000, his lost railroad earnings would have been $387,000. Moreover, one can see from these figures that there is support in the evidence for similar loss figures for the two plaintiffs.

The Court of Appeals noted: "In addition to [the profile] differences, we note that Van Aken presented expert testimony concerning his loss of future income while Kuhl did not." The lack of expert testimony for Kuhl seemed significant to the Court of Appeals. There is no requirement that lost income be established by expert evidence. Where, as in Kuhl's case, a figure is ascertainable by a simple computation, there would seem to be no reason for counsel to hire an economist. Van Aken's case presented a somewhat more involved calculation, which counsel may have believed warranted expert explanation. This difference in the way the two plaintiffs' cases were presented should not

account for any difference in the loss figure assigned to each plaintiff.

Wright, Green Country Inn, and ATSF contend that the awards were influenced by passion and prejudice and that the jurors failed to consider the claims of the plaintiffs separately and independently, as they were instructed to do. Their claim of error is not strictly that the awards are excessive in light of the evidence. Their claim is that the precise identity of the awards for the two plaintiffs manifests the improper deliberations by which the jurors arrived at the award figures. The Court of Appeals, too, discussed the awards as products of the jury's failure to heed instructions.

In *City of Ottawa v. Heathman*, 236 Kan. 417, 690 P.2d 1375 (1984), this court affirmed the trial court's granting of a motion for new trial on the ground that the jurors disregarded the instruction on calculating damages, added the amounts that each thought was appropriate and divided by six, and ultimately used the figure suggested by the foreman.

Of interest in *Heathman*, beyond the phenomenon of quotient verdicts, is this court's review of Kansas cases which "have held that a new trial may be ordered when it is evident the jury has not followed court's instructions." 236 Kan. at 421. Examples given of cases involving erroneous damages awards were *Dicker v. Smith*, 215 Kan. 212, 523 P.2d 371 (1974) (punitive damages awarded where no actual damages had been awarded), and *Timmerman v. Schroeder*, 203 Kan. 397, 454 P.2d 522 (1969). *Timmerman* was a personal injury case arising from an automobile collision. Plaintiff was awarded the amount of her medical expenses but nothing for pain and suffering which had been shown by uncontradicted evidence. The inadequate damages looked suspiciously like a compromise involving liability and damages issues. "Such a compromise infects the entire verdict of the jury and renders it totally invalid." 203 Kan. at 401.

This court, in *Heathman*, noted:

"In all of these cases it was evident from the verdict reached that the jury had acted in contravention of the court's instructions and of the evidence. Disregard of the instructions was sufficient cause for the courts to grant a new trial. In the present case, it is not evident from the jury's verdict that the jury failed to follow the court's instruction. In fact, the trial

court specifically found that the verdict was not contrary to the evidence, but was within the range of damages contained in the evidence. The court learned of the jury's failure to follow instructions only after the filing of the juror's affidavit and upon questioning the jurors at the hearing on the motion for a new trial. Whether this evidence could be used in determining whether to grant a new trial is a separate issue." 236 Kan. at 424.

Recognizing that jury misconduct in intentionally disregarding the court's instructions will invalidate a verdict, this court said:

"Misconduct by the jury, when it occurs, may be uncovered and the truth and veracity of those testifying to such misconduct can be tested. The matters set forth in the affidavits, if proven, must establish a conscious conspiracy by the members of the jury to disregard and circumvent the instructions on the law given by the court. If they do so, the jurors would have violated their oaths as jurors." 236 Kan. at 425.

Although finding in *Heathman* that the affidavits were sufficient to show the jury had deliberately disregarded the instructions, this court emphasized that a new trial will not be granted on mere allegations. "There must be evidence, as here, that the jury consciously conspired to undermine the jury process by ignoring the instructions. Otherwise, it must be presumed that the jury has properly determined the before and after values before arriving at damages." 236 Kan. at 426.

The defendants in the present case contend that the awarding of identical economic and non-economic damages to the plaintiffs was error as a matter of law. The defendants argue that the awarding of identical damages indicates that the jury did not follow the instructions in determining the damages or that the verdict was a result of passion or prejudice. The defendants cite no authority for such a proposition, nor are we aware of any. We find no merit in the defendants' argument. There is no rational basis to conclude that the jury disregarded the instructions simply because it awarded the plaintiffs identical damages. Absent evidence to the contrary, it will be presumed that the jury followed the court's instructions in awarding damages. We find no evidence in the record to indicate that the jury disregarded the instructions in awarding damages.

Where the alleged failure of the jury to follow instructions is not evident from the verdict or shown by definite proof, but is based solely on the fact that damages awarded to the plaintiffs are identical, the awards will be upheld if supported by the

evidence and if they do not shock the conscience of the court. Based upon the record before this court and our standard of review, we find no error in the jury's award of damages.

The judgment of the Court of Appeals is affirmed in part and reversed in part. The judgment of the district court is affirmed.

ABBOTT, J., not participating.

■ TERRY L. BULLOCK, district judge, assigned.