2000 ME 150

**Andrea HARRIS et al.**

v.

**Joseph SOLEY et al.**

Supreme Judicial Court of Maine.

Argued April 5, 2000.
Decided July 28, 2000.

---

**502**

Gregory P. Hansel, Esq., (orally), John P. McVeigh, Esq., Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Portland, for plaintiffs.

Peter J. Rubin, Esq., (orally), Glenn Israel, Esq., Bernstein, Shur, Sawyer & Nelson, P.A., Portland, for defendants.

Panel WATHEN, C.J., and CLIFFORD, RUDMAN, SAUFLEY, ALEXANDER, and CALKINS, JJ.

SAUFLEY, J.

[¶ 1] Joseph Soley, Monopoly, Inc., Jobar, Inc., Seamen's Club, Inc., Christopher Stafiej, and Preston Wilkin[1] appeal from a judgment entered against them by the Superior Court (Cumberland County, *Mills, J.*) on a complaint filed by former tenants. The defendants appeal both from the default judgment on liability, entered by the court as a sanction for discovery violations, and from the judgment entered on the jury's verdict on damages. We affirm the judgments.

1. The defendant corporations, Monopoly, Inc., Jobar, Inc., and Baker's Table, Inc., d/b/a Seamen's Club, are owned and controlled by Joseph Soley. Defendants Christopher Stafiej and Preston Wilkin were employees or agents of the corporations. We will

## I. BACKGROUND

### A. Factual Background

[¶ 2] Near Labor Day of 1997, Andrea Harris, Kimberly Nightingale, Karen Simard, and Michelle Dussault[2] moved into a large apartment that was located in the Old Port area of Portland and owned by Joseph Soley. Soley had promised the tenants that the apartment, which had previously been condemned by the City of Portland, would be repaired by the time they moved in. When they arrived, the condemnation notice was still on the door. Upon entering the apartment, they found it in an uninhabitable condition. They spoke to Soley's property manager who indicated that if the tenants were willing to clean the apartment themselves, she would credit them with $750 of their $1000 monthly rent for the month of September. They rented a steam cleaner, bought various cleaning supplies, and cleaned the apartment themselves. Soley's property manager also suggested that they buy a new refrigerator and deduct it from the rent because the one in the apartment did not work.

[¶ 3] Despite their efforts to clean the apartment, the tenants continued to have problems with infestations of mice and cockroaches, as well as a persistent odor of cat urine. A dead cat was eventually found beneath the floorboards. The apartment had no heat during the month of October. One tenant slept with blankets over her head, not only because of the cold, but also to keep bugs away from her. These problems persisted into November, and the tenants submitted to Soley a list of complaints including a broken skylight, a broken toilet, a broken garbage disposal, a leaking roof, and cockroach infestation. As winter arrived, snow would fall into the

refer to Soley and his corporations collectively as Soley.

2. We will refer to the plaintiffs collectively as the tenants.

living room through the broken skylight. When Soley did not make the needed repairs, the tenants stopped paying rent. During this period, Soley telephoned them on several occasions regarding the rent and spoke to the tenants in a rude and abrasive manner. In February, the property manager told the tenants that Soley had begun eviction proceedings against them.

[¶ 4] The tenants eventually found another place to live and had begun moving out by April 1, 1998.[3] While the tenants were in the process of moving out, but were away from the apartment, Soley's agents broke into the apartment and took many of the tenants' remaining belongings. Upon confrontation with the returning tenants and police officers who had been called to the scene, Soley's agents indicated that Soley had directed their actions. Eventually, the officers and one of the tenants went to an apartment nearby and recovered some, but not all, of the missing property.

[¶ 5] The tenants then sought out Soley to request that he return their remaining possessions. They located him at his restaurant, the Seamen's Club. According to one of the tenants, he replied that he would return their property only after they paid him $3000.[4] He then ordered them to leave and threatened to call the police and have them forcibly removed. Soley told the tenants that he knew where they were moving and where their families lived, a statement that the tenants took as a threat.

B. Procedural Background

[¶ 6] On June 18, 1998, the tenants brought suit against the defendants in a complaint that included claims for conversion, intentional infliction of emotional distress, punitive damages, breach of contract, wrongful·eviction, and wrongful retention of a security deposit. The court set a discovery deadline of February 1, 1999. As discovery proceeded, Soley repeatedly failed to comply with appropriate discovery requests, failed to make the apartment available for inspection, and, later, failed to make witnesses available for deposition. Eventually, the tenants filed a motion to compel discovery. The parties reached agreement on certain aspects of discovery and the court entered an order compelling the delivery of documentary discovery by December 20. When the defendants did not comply with that order, the court sanctioned the defendants by entering judgment against them on all counts, leaving only the matter of damages for trial. When Soley again failed to comply with damage-related discovery requests, the court precluded him from offering certain evidence in the trial on damages.

[¶ 7] At the two-day jury trial on the issue of the tenants' damages, the trial judge read the complaint to the jury and explained that they were to accept those facts as true and would only be required to address the question of damages.[5] After hearing the evidence, the jury awarded each of the tenants $15,000 for intentional infliction of emotional distress, $110 for breach of contract, and damages varying from $250 to $1060 on their claims for conversion. They also awarded a total of $1 million in punitive damages against Joseph Soley, Monopoly, Inc., Seamen's Club, Baker's Table, Inc., and Jobar, Inc., and $4000 against Christopher Stafiej. The court entered its judgment in accordance with the jury's determinations of damages, along with additional damages determined by the court and those agreed

---

3. This was roughly one week before the eviction proceedings were scheduled for a hearing.

4. This number apparently represented rent that he believed·they owed him.

5. A few statements from the complaint, primarily regarding matters submitted by agreement of the parties to the court for adjudication, were redacted after the court consulted with counsel.

to by the parties on the claims for wrongful eviction, wrongful retention of a security deposit, and breach of implied warranty of fitness for human habitation.[6] This appeal followed.

## II.  DISCUSSION

### A.  Entry of Judgment as a Discovery Sanction

[¶ 8] Soley first challenges the court's imposition of a judgment against all defendants on all claims of liability as a sanction, pursuant to M.R. Civ. P. 37(b)(2)(C),[7] for discovery related conduct.  Soley argues that the court abused its discretion by imposing the ultimate sanction without providing the defendants another chance to comply with the discovery order, and without issuing a warning that the court was contemplating the entry of judgment as a sanction.[8]

[¶ 9] We review the imposition of sanctions for discovery violations for an abuse of discretion, but will more closely scrutinize sanctions such as dismissal or default.  *See Saucier v. State Tax Assessor*, 1998 ME 61, ¶ 6, 708 A.2d 281, 283.  Nevertheless, "[a]lthough we recognize the constitutional implications of dismissal and give greater scrutiny to the decision to dismiss than we would give to a lesser sanction, we will not lightly overrule the trial court's decision."  *Orlandella v. O'Brien*, 637 A.2d 105, 106 (Me.1994) (citing *Fallon v. Casco–Northern Corp.*, 462 A.2d 53, 56 (Me.1983); *Reeves v. Travelers Ins. Cos.*, 421 A.2d 47, 50 (Me.1980)); *see also Pelletier v. Pathiraja*, 519 A.2d 187, 190 (Me.1986).[9]

[¶ 10] A court that is called upon to determine an appropriate sanction for a discovery violation must understand the facts at issue, the factors and the law material to its decision, and must weigh the factors accordingly.  The factors to be weighed when the court considers imposing sanctions for discovery violations include, but are not limited to, "the purpose of the specific rule at issue, the party's conduct throughout the proceedings, the party's *bona fides* in its failure to comply,

---

6. The tenants were awarded $1000 for wrongful eviction, $666 for wrongful retention of their security deposit, and $1834 for breach of the implied warranty of fitness for human habitation.  The court also awarded costs and attorney fees.

7. M.R. Civ. P. 37(b)(2)(C), as it existed at the time, provided in pertinent part:

   **(b)  Failure to Comply With Order.**
   . . . .
   (2) *Sanctions by Court in Which Action Is Pending.*  If a party or an officer, director, or managing agent of a party or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule or Rule 35, the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:
   . . . .
   (C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party.

M.R. Civ. P. 37(b)(2)(C) (amended effective May 1, 1999).

8. Soley argues that the default judgment violated the defendants' due process rights because they were not warned by the court that their conduct could result in a default judgment.  The rules of procedure, however, provide ample warning that a failure to comply with an order compelling discovery may result in a default judgment against the disobedient party.  *See* M.R. Civ. P. 37(b)(2)(C).  Moreover, the defendants were given an opportunity to respond to the request for sanctions both in writing and at the hearing on the motion for sanctions.  *Cf. Ireland v. Galen*, 401 A.2d 1002, 1005 (Me.1979) (holding a party could not complain of unfair surprise at the court's sanctions when he was served with the motion for sanctions and had an opportunity to explain his noncompliance at a hearing).

9. "Serious instances of noncompliance with pretrial procedures can support a trial court's determination that the ultimate sanction of dismissal or default is the appropriate sanction."  *Employee Staffing of Am. v. Travelers Ins. Co.*, 674 A.2d 506, 508 (Me.1996).

prejudice to other parties, and the need for the orderly administration of justice." [10] *Baker's Table, Inc. v. City of Portland,* 2000 ME 7, ¶ 17, 743 A.2d 237, 243. The court must also consider the purposes to be served by imposing sanctions, including penalizing the noncompliant party, remedying the effects of the noncompliance, and deterring similar conduct by the offending party, as well as by others. *See Pelletier,* 519 A.2d at 190; *Reeves,* 421 A.2d at 50.

[¶ 11] When the court has determined the facts without error and has understood the factors and law material to the decision at hand, we defer to the trial court and will find an abuse of discretion only where the court makes a "serious mistake" in weighing the applicable factors. *See West Point–Pepperell, Inc. v. State Tax Assessor,* 1997 ME 58, ¶ 7, 691 A.2d 1211, 1213.

[¶ 12] In the matter before us, the court had before it evidence that Soley failed at every turn to comply with Rule 26, failed to cooperate in good faith in providing access to the apartment, failed to make witnesses reasonably available for deposition, and ultimately failed to comply with the court's order compelling compliance with the rules. By the date first scheduled for hearing on the tenants' motion for discovery sanctions—over seven months after the service of the complaint and first request for documents, two days short of the close of discovery, and more than a month after the date by which compliance had been ordered by the court—Soley had produced not a single document, the apartment had not been made available for inspection, and only one deposition had been taken.[11]

[¶ 13] As a result of the delay occasioned by Soley's conduct, discovery had barely begun on the day that the court had set for the *close* of discovery. The tenants and their attorneys were required to spend unnecessary time and money setting up and canceling depositions, writing letters, scheduling conferences with the court, and attending hearings. The tenants were effectively prevented from preparing their case and on the eve of trial had received almost no meaningful discovery. It is difficult to imagine a more unprincipled approach to the discovery process.

[¶ 14] Soley argues, nonetheless, that the defendants should not have been exposed to the ultimate sanction for two reasons: first, Soley argues that the court was unaware of whether his attorney had kept him informed on discovery issues, and second, Soley insists that the defendants only engaged in a clear violation of one court order.[12] Both arguments lack merit.

[¶ 15] Regarding Soley's first argument, "it is well settled that the knowledge of trial counsel is imputed to plaintiff." *Orlandella,* 637 A.2d at 106 n. 1. The conduct of discovery constitutes no exception to that rule. Soley's complete failure to comply with his discovery obligations, regardless of his relationship with his at-

---

10. A trial court need not find willfulness, bad faith, or fault in order to justify a sanction such as dismissal. *See Employee Staffing of Am.,* 674 A.2d at 508; *Orlandella,* 637 A.2d at 106.

11. An example of the dilatory tactics employed during discovery relates to the tenants' request to inspect the apartment. When their initial efforts to obtain Soley's cooperation failed, they filed a motion to compel, seeking a court order allowing them access to the premises. Once the motion was filed, Soley promised to cooperate in allowing the tenants to inspect the apartment. Accepting that representation, the tenants did not pursue their motion. As soon as the tenants abandoned the motion to compel, the defendants returned to their prior uncooperative conduct, failing to provide any access except for a single occasion when Soley gave an unreasonable 30–minute notice that the apartment could be viewed at 9 A.M. Sanctions for such chicanery should be swift and certain.

12. After hearing, the court entered an order on December 10, 1998, compelling production of documents within 10 days. No documents were produced until February 1, 1999, at which time Soley produced only some of the requested documents.

torney, requires that the defendants be held fully accountable.

[¶ 16] Soley's second argument, that default judgment was an inappropriate sanction given the fact that the defendants only failed to comply with one court order, demonstrates a critical misapprehension of the rules of discovery. Our discovery rules are designed to "eliminate the sporting theory of justice," *Reeves*, 421 A.2d at 50, and are based on concepts of voluntary cooperation.[13] A party to a lawsuit has a duty to comply with the rules regarding discovery throughout the litigation.

[¶ 17] Recourse to the authority of the court for orders compelling compliance with the rules must be the exception rather than the rule. Ordinarily, the court's intervention in discovery matters should be necessary only where there is a legitimate dispute regarding the responsibility of one party to provide certain discovery. When one party forces another to obtain a court order merely to enforce an obligation that is not legitimately in dispute, that party wastes the court's resources, causes unnecessary expense to the opposing party, and delays the ultimate resolution of the suit. Hence, a party's failure to cooperate in discovery prior to the entry of a court order compelling compliance constitutes "conduct throughout the proceeding" that may be considered by a court in determining an appropriate sanction for purposes of M.R. Civ. P. 37(b). *Baker's Table, Inc.*, 2000 ME 7, ¶ 17, 743 A.2d at 243.

[¶ 18] There can be no question on the record of this case that Soley failed to comply with the rules of discovery, caused additional expense and delay by his conduct, and failed to comply with the court order requiring his compliance. The court acted well within the bounds of its discretion when it entered judgment in favor of the tenants on all claims as a discovery sanction.

### B. In Limine Ruling Excluding Evidence of Joseph Soley's Debts

[¶ 19] After default on liability was imposed as a sanction for Soley's failure to provide discovery, the court issued another discovery order in March 1999 compelling defendants to provide requested financial information. Notwithstanding what was, at that point, the obvious risk of failing to provide discovery, Soley failed once again to provide any meaningful information.[14] Finding that there had been absolutely no effort on Solely's part to verify or even investigate the figures provided to the tenants, the court concluded that there was no reliable information provided by Soley regarding his financial liabilities and therefore that it would be improper to allow him to testify regarding liabilities at trial.

[¶ 20] As with the court's first sanction for discovery violations, we review the order for an abuse of discretion, looking to the same factors and principles as set out above, and we conclude that the court acted well within the range of its discretion in fashioning the sanction for Soley's continued failure to comply with the court's orders regarding production of his financial documents.

### C. Admission of Evidence of Previous Violations of the City's Code

[¶ 21] Soley next argues that the court erred by admitting evidence of So-

---

13. *See Butler v. Poulin*, 500 A.2d 257, 259 (Me.1985).

> Liberal discovery is one of the principal devices available to effectuate the purpose of the Maine Rules of Civil Procedure "to secure the just, speedy and inexpensive determination of every action." "Conduct of counsel or his clients that frustrates the beneficent purposes ... of discovery orders must be appropriately penalized."

*Id.* (quoting M.R. Civ. P. 1; *Reeves*, 421 A.2d at 50) (omission in original).

14. Other than providing two tax returns, Soley provided only a handwritten list that indicated the amount of his liabilities in vague and useless terms such as: "varies 1,000,-000—5,000,000 ... 2,500,000—0 ... 6,000,-000—0 ... 5,000,000 to 10,000,000," on various debts.

ley's prior building code violations in the City of Portland on the issue of punitive damages. Soley contends that the evidence was irrelevant to the determination of punitive damages stemming from either the claim for conversion or the claim for the intentional infliction of emotional distress.

[¶ 22] Any analysis of relevance regarding the determination of punitive damages in this case necessarily begins with a review of the facts conclusively established upon the adjudication by default of liability on the conversion and emotional distress claims.[15] In the count alleging intentional infliction of emotional distress, the tenants reallege the general facts recited in their complaint, including, *inter alia*, Soley's repeated broken promises to fix the numerous problems with the tenants' apartment, his refusal to fix the apartment following an inspection by the Portland Code Enforcement Officer in September, and the continuing condemnation of the premises as unfit for human occupation.

[¶ 23] Thus, the tortious conduct proved by the tenants was not limited to the break-in, as Soley argues, but encompassed the ongoing conduct of the defendants, including repeated refusals to fix problems amounting to code violations. It is well established that prior misconduct by a defendant that is similar to the misconduct giving rise to liability is relevant to the determination of punitive damages. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 576–77, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (citing *TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 462 n. 28, 113 S.Ct. 2711 n. 28, 125 L.Ed.2d 366 n. 28 (1993); *Gryger v. Burke*, 334 U.S. 728, 732, 68 S.Ct. 1256, 92 L.Ed. 1683 (1948)). This approach reflects one of the primary

purposes of punitive damages in allowing that "a recidivist may be punished more severely than a first offender [because] repeated misconduct is more reprehensible than an individual instance of malfeasance." *BMW*, 517 U.S. at 577, 116 S.Ct. 1589.[16]

[¶ 24] The court did not err in admitting, on a carefully limited basis, evidence of prior conduct relating to repeated failures to fix serious habitability problems.

## III. DAMAGES

### A. Emotional Distress Damages

[¶ 25] The jury awarded each of the tenants $15,000 as damages for emotional distress. The defendants argue that the evidence does not support an award to each of the tenants in identical amounts. In addition, Soley relies on the fact that the awards are identical to support a claim that the awards are the result of passion and prejudice.

[¶ 26] The determination of damages is the " 'sole province of the factfinder,' [and] we will not disturb the jury's decision unless there is *'no basis* in the evidence for the award,' " *Tang of the Sea, Inc. v. Bayley's Quality Seafoods, Inc.*, 1998 ME 264, ¶ 8, 721 A.2d 648, 650 (quoting *VanVoorhees v. Dodge*, 679 A.2d 1077, 1081 (Me.1996) (emphasis in original), or unless "the jury acted under some bias, prejudice, or improper influence," *Lawrence v. Saunders*, 539 A.2d 1102, 1103 (Me.1988)) (citations omitted), *quoted in Town of Stonington v. Galilean Gospel Temple*, 1999 ME 2, ¶ 17, 722 A.2d 1269, 1273.

[¶ 27] Contrary to Soley's argument, the jury was not required to find

**15.** Although punitive damages are not available for a mere breach of contract, *see Drinkwater v. Patten Realty Corp.*, 563 A.2d 772, 776 (Me.1989), the existence of a separate tort may support a punitive damage award, *see Stull v. First Am. Title Ins. Co.*, 2000 ME 21, ¶ 14, 745 A.2d 975, 980.

**16.** *Cf. Burbach v. Investors Management Corp. Int'l*, 326 S.C. 492, 484 S.E.2d 119, 121–22 (1997) (holding that evidence of landlord's attempts to keep prior tenants' security deposits was relevant to claim for punitive damages stemming from claim for conversion of security deposit).

that each of the tenants suffered identical emotional distress in order to award the same amount of damages to each; rather, the jury need only have found that the emotional distress suffered by each, regardless of the nature of that distress, warranted comparable monetary compensation. The evidence introduced at trial, including evidence of Soley's conduct and the tenants' testimony regarding their emotional responses, could support a determination that the tenants suffered comparable emotional distress.

[¶ 28] We also reject the defendants' argument that the awards must necessarily be the product of passion and prejudice because they are identical. The mere fact that different tenants receive identical awards does not establish the existence of bias or prejudice. *See, e.g., Lambert v. Ackerley,* 180 F.3d 997, 1011 (9th Cir.1999); *Kuhl v. Atchison, Topeka & Santa Fe Ry. Co.,* 250 Kan. 332, 827 P.2d 1, 9 (1992) ("There is no per se rule which discredits identical awards, and there is no provision in the current law for comparison of one plaintiff's recovery with another's to serve as the basis for overturning a jury's verdict."). The court did not err in declining to set aside the jury's award of emotional distress damages.

B. Punitive Damage Award

[¶ 29] Finally, Soley challenges the award of $1 million in punitive damages as excessive. Again, we begin with the facts of the complaint as conclusively established by the default judgment. Among other things, those facts included the following:

Plaintiffs were shaken up, infuriated, violated, intimidated and in fear for their physical safety .... The conduct of Defendants, and each of them, was so ex-

treme and outrageous as to exceed all possible bounds of decency. Their conduct would be regarded as atrocious and utterly intolerable in a civilized community.... Defendants acted intentionally, knowingly, willfully, wantonly and with malice ....

[¶ 30] From these and other facts addressed previously, there can be no question that the jury was justified in deciding that an award of punitive damages was warranted. *See McAlister v. Slosberg,* 658 A.2d 658, 660 (Me.1995) (holding that punitive damages may be based on a default judgment). Thus, the questions presented are: (1) whether the award is so excessive as to violate our concepts of due process, *see BMW,* 517 U.S. at 568, 116 S.Ct. 1589, and (2) whether the award is excessive in light of the relevant mitigating and aggravating factors considered by the jury, *see Tuttle v. Raymond,* 494 A.2d 1353, 1359 (Me.1985).[17]

[¶ 31] In determining whether the award is excessive, we first examine the amount in light of due process considerations. *See BMW,* 517 U.S. at 568, 116 S.Ct. 1589. The Supreme Court in *BMW* suggested a multi-part analysis to provide guidance in appellate review of punitive damage awards and developed "guideposts" to determine whether a defendant has been put on sufficient notice that his or her conduct will be subject to a penalty and has notice of the possible scope of that penalty. *See id.* at 568–85, 116 S.Ct. 1589. Relevant to the matter before us are: (1) the degree of reprehensibleness of the conduct; (2) the disparity between the punitive award and the actual harm; and (3) the amount of sanctions generally imposed for comparable conduct. *See id.* at 575, 116 S.Ct. 1589.[18]

---

**17.** Although a factfinder has considerable discretion in determining the appropriate amount of a punitive damages award, that discretion is not "open-ended" and must be constrained by a careful consideration of the factors relevant to the conduct at issue. *See Tuttle,* 494 A.2d at 1359.

**18.** Ordinarily, we would first address the "identification of the state interests that a punitive award is designed to serve." *Id.* at 568, 116 S.Ct. 1589. Here, the parties do not dispute the State's interest in discouraging the abuse of tenants by landlords. That interest has been expressed in numerous statutes

[¶ 32] The degree of reprehensibleness of the conduct in this case has been established as severe.[19] The tenants had to endure the presence of insect and rodent infestations, dead animals, snow falling into the apartment, and a total lack of response from their landlord after repeated complaints. Soley's continued refusal to repair conditions that rendered the apartment unfit for human occupation, the violent removal of tenants' property before eviction proceedings had proceeded, the retention of property belonging to the tenants, the destruction of their property, and his threatening behavior combined to create a pattern of conduct that must be considered intolerable.

[¶ 33] We look next to the disparity, if any, between the conduct and the punitive damage award.[20] It is helpful to begin with a determination of the ratio between the punitive damage award and the compensatory damages. The ratio is this instance, although high, is not "breathtaking." *BMW,* 517 U.S. at 583, 116 S.Ct.

1589. The jury awarded the tenants a total of $62,060 on their claims for conversion and intentional infliction of emotional distress and a total of $1 million in punitive damages, yielding a ratio of roughly 16 to 1.[21] Thus, the ratio of compensatory to punitive damages does not disclose a constitutional infirmity. Nor is the award wholly out of proportion to the injuries inflicted. The unmitigated abuse of tenants by a landlord over a period of months is sufficient to support an award of this magnitude.

[¶ 34] We next review the difference between the award in this case and civil penalties authorized or awarded in other cases.[22] Again, it bears repeating that the jury was required to accept as true all allegations contained in the tenants' complaint. Although we have not found other cases in which a punitive damage award of this size occurred in similar circumstances, neither have we found a case involving such a pattern of egregious

---

addressing the relationship between landlords and tenants. *See, e.g.,* 14 M.R.S.A. § 6014 (Supp.1999) (providing tenants with remedy for wrongful eviction); 14 M.R.S.A. § 6021 (1980 & Supp.1999) (providing that landlord is bound by covenant of fitness for human habitation); 14 M.R.S.A. § 6034 (Supp.1999) (providing for double damages when landlord wrongfully retains security deposit); 14 M.R.S.A. § 6030 (Supp.1999) (providing it is an unfair trade practice for a landlord to require a tenant to waive rights with respect to process and security deposits, and declaring certain types of provisions unenforceable).

**19.** *Cf. Waxler v. Waxler,* 1997 ME 190, ¶ 15, 699 A.2d 1161, 1165.

**20.** Soley contends that the punitive damage award should be measured against the civil penalties he could be charged with for wrongful eviction and retention of the security deposit. This position ignores that the punitive damages were not solely based upon these acts, but upon a pattern of intimidation and wrongful conduct toward Soley's tenants.

**21.** Other courts have allowed the imposition of punitive damages bearing ratios as high as 100 to 1 to compensatory damages that have been upheld. *See Williams v. Aetna Fin. Co.,*

83 Ohio St.3d 464, 700 N.E.2d 859, 871 (1998); *see also, e.g., Hampton v. Dillard Dep't Stores, Inc.,* 18 F.Supp.2d 1256, 1277 (D.Kan. 1998) (refusing to set aside $1.1 million punitive award on $56,000 compensatory award, a ration of approximately 20 to 1); *Deters v. Equifax Credit Info. Servs., Inc.,* 981 F.Supp. 1381, 1390 n. 9 (D.Kan.1997), *aff'd,* 202 F.3d 1262 (10th Cir.2000) (refusing to set aside $295,000 punitive award on $5000 compensatory award, a ratio of approximately 59 to 1); *Blume v. Fred Meyer, Inc.,* 155 Or.App. 102, 963 P.2d 700, 709 (Or.App.1998) (upholding a $450,000 punitive award on a $25,000 compensatory award, a ration of 18 to 1). In the one case the tenants cite with a higher ratio of 111 to 1, *Continental Trend Resources, Inc. v. OXY USA, Inc.,* 101 F.3d 634 (10th Cir. 1996), the court actually found the punitive damage award of $30 million "exceed[ed] the constitutional limit" after doing a *BMW* analysis. *Id.* at 642. The court then reduced the punitive damages to $6 million by remittitur. *See id.* at 642–43. This still yields a ratio of 22 to 1, higher than the ratio in this case.

**22.** Moreover, the evidence demonstrated that the specific landlord in this case owns numerous rental properties; accordingly, the State has a particular interest in discouraging future misconduct by the defendants in this case.

**510**

behavior that has not been deterred by municipal sanction and that resulted in extreme distress to the tenants. On this record, we cannot conclude that punitive damages in the amount of $1 million to four plaintiffs was excessive.

[¶ 35] Finally, we consider whether the award is excessive in light of the relevant factors considered by the jury. *See Tuttle*, 494 A.2d at 1359. Because several of those factors are coextensive with the guideposts set out by the Supreme court in *BMW* and are considered above, and because, on this record, we find no mitigating factors, we need address only the ability of the defendant to pay the award. *See Hanover Ins. Co. v. Hayward*, 464 A.2d 156, 158 (Me.1983).[23] Because evidence was presented regarding the assets and income of the wrongdoer, we consider whether the penalty imposed was excessive in light of those assets. Given Soley's extensive assets and income, as well as his own evasive testimony on the question of his net worth,[24] the amount selected by the jury does not offend our concepts of a fair judgment, nor does it reflect an untenable disparity between the goal of deterrence and the punitive damage award.

The entry is:

Judgment affirmed.

23.  *See Caron v. Caron,* 577 A.2d 1178, 1180 (Me.1990) (holding financial condition of defendant to be only one factor in the consideration of a punitive damage award). *But see Ferrell v. Cox,* 617 A.2d 1003, 1008 (Me.1992) (holding that there is no constitutional requirement that the jury consider financial circumstances in determining amount of punitive damages).

24.  Soley refused to provide specific values for most of his assets. He testified that a statement from Morgan Stanley/Dean Witter indicating that he had a net worth of $55 million dollars was inaccurate and that he never provided such information to them, but he declined to answer specific questions regarding his net worth. In the course of his testimony, a copy of his 1997 tax return was introduced that indicated a gross income of $4.5 million on which he paid $1.2 million in taxes. A draft of his 1998 tax return was also introduced showing an estimated gross income of roughly $1.4 million. He testified that the discrepancy was due to his sale of a lot of property in the 1997 tax year.