STATE OF MAINE
Knox. S.S., Clerks Office
SUPERIOR COURT

FEB 11 2003

RECEIVED AND FILED
Susan Guillette, Clerk

STATE OF MAINE

KNOX, ss.

WILLIAM CARVER d/b/
BILL'S PUMP AND TANK
SERVICE,

    Plaintiff and
    Counterclaim Defendant

    v.

SHELLFISH U.S.A. and
WILLIAM ATWOOD,

    Defendants and
    Counterclaim Plaintiffs

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-00-034
JRA - KNO - 2/11/2003

DECISION AND ORDER

DONALD L. GARBRECHT
LAW LIBRARY

FEB 13 2003

## I. Introduction.

This matter is before the court on the complaint of William Carver (Carver), d/b/a Bill's Pump and Tank Service, in which the plaintiff alleges that the defendants, Shellfish U.S.A. (SUSA) and its principal, William Atwood (Atwood), breached a contract for Carver to install a fuel pump system on SUSA's property in Tenants Harbor. Carver claims that he performed work and provided materials in furtherance of this contract but that SUSA has failed to pay him. He has expressed this grievance in a two-count complaint, the first alleging breach of contract, the second, unjust enrichment.

The defendants have responded to this complaint with a counterclaim in which they acknowledge having retained the plaintiff to make improvements on their property but that he failed to do so in a timely, workmanlike manner which resulted in loss of profits to the defendant. SUSA also alleges that Carver entered on to its property on or about February 22, 1999, without license or privilege, and tampered with SUSA's

fuel equipment and that this act was committed with malice. Last, SUSA claims that Carver left equipment at the site which he has failed to take away despite a notice from the defendant to do so.

SUSA's counterclaim contains six counts. Count I alleges breach of contact. Counts II, III and IV cite Carver's trespass on the defendants' property and, as to count III, the complaint asks for the award of the special damages provided for in 14 M.R.S.A. § 7551-B. Also as to the alleged trespass, the defendants seek punitive damages via count V because, they say, the plaintiff committed this tort with malice. Finally, in count VI, the defendants seek a lien on the property they say Carver left on their site so that they may sell it.

The case was tried without a jury and is in order for disposition.

## II.     Findings of Fact and Conclusions of Law.

Sometime in 1997, William Atwood, SUSA's principal, decided that he needed to remove underground fuel tanks and replace the fuel pumping systems as part of a plan to renovate his shellfish buying plant in Tenants Harbor. To that end he and Scott Thebeau (Thebeau), the plant manager, decided to hire Carver to remove the old fuel tanks and upgrade the fuel system.

In September of 1997, Carver removed a fuel tank as agreed[1] but did not install a new tank as Atwood had determined that he could do that himself by purchasing a new tank independently and having his regular employees prepare the site where it would rest. Thereafter, Thebeau asked Carver for a proposal to perform the rest of the work which would entail running pipes from the new tank to a new fueling station which would be installed. Carver responded and the parties ultimately agreed in late October of 1997 that the plaintiff would do this job on a time and materials basis.

---

[1] The parties agree that Carver was paid for removing this old fuel tank.

2

In February of 1998, Carver attached the new tank to the old pumps on the wharf with new galvanized pipes. He also installed anti-siphoning valves on this new tank.[2] The new pipes, however, were to be temporary as different pipes would be used for the new pumping station when it was installed.

Before the new pipes and pumping station could be installed, electrical service for the station had to be established and hangers for the new pipes had to be drilled into the granite pilings of the pier. As to the latter, again Atwood believed his own employees could undertake this work so that the responsibility for installing the hangers for the pipes Carver would install became the defendants'. However, the hangers installed by these workers were, in Carver's judgment, too small, of insufficient gauge, and too far apart to support the pipe he had purchased to run to the new pumping station. Accordingly, he asked, and Atwood agreed, to correct this problem so that the work could proceed.

While the testimony conflicts as to when the appropriate hangers were installed, by late Spring of 1998, however, Carver had been told that the site was ready for his work. Accordingly, he arranged for the delivery of materials to the wharf so he could complete the job. These materials were delivered on various occasions through August of 1998.

Two circumstances, however, prevented Carver from proceeding. The first was that he was busy with the demands of other jobs. The second was that he was still dissatisfied with the installation of the hangers which, in his view, were inadequate.

According to Carver's account, which the court finds to be the most accurate as to this aspect of the parties' dispute, he was called in early September and told that the

---

[2] Carver claims he has not been paid for his time and materials for this work which amount to $3,064. The defendants agree and acknowledge the plaintiff is entitled to a judgment in this amount.

proper hangers had been installed but replied that he could not come to do the work for two to three weeks because of other job demands. At about this time, Atwood became frustrated with the slow progress of his project and called Carver's wife to complain. He next directed Thebeau to find another contractor to complete the job.

Because Atwood had called his wife, Carver went to the SUSA wharf where he met with Thebeau who told him that Atwood was going to find someone else to finish the project. Thebeau also told Carver that Atwood might "calm down" upon which he would call Carver to come finish the job.

In December, Carver and Thebeau spoke about paying Carver for his work and materials up to that point and about the delivery of the remaining material required to complete the job. Thebeau assured Carver that he would be paid and, on December 18, 1998, Carver had the last shipment of material delivered to SUSA's wharf, having sent Thebeau an invoice on December 14 for his labor and materials, including those that would be delivered on the 18th.[3] On the 18th, Thebeau told Carver that Atwood had no intention of paying his bill but that he would try to intercede so that it would be paid.

In late December of 1998 or early January of 1999, Thebeau, at Atwood's direction, began to look for a new contractor to finish the project of installing pipes and new fuel pumps. Ultimately, Thebeau found G.R. Adams, Inc. (Adams) to complete the job who, on January 21, 1999, gave a price quote of $22,310 to perform the work.

Thebeau asked Adams to make an effort to "purchase" the material that Carver had left on site for their work. Thebeau Dep. T., p. 27. Moreover, Atwood instructed Adams to use this equipment in the job and sent Adams Carver's invoice with the list of

---

[3] Thebeau's testimony as to these events differs from Carver's, but the court finds that the plaintiff's testimony is the more reliable as to this part of the parties' disagreement.

4

material he had delivered. Apparently, Adams chose not to use the equipment and it remains at SUSA's wharf in a warehouse.

On February 22, 1999, Carver returned to SUSA's wharf to visit Thebeau to see if arrangements had been made to pay him or if the work had been completed. He had no interview with Thebeau because he learned he was not there. Instead, he climbed on to the top of the new tank and tampered with the valve there. As a result, when it came time to use the pumps the following day, they would not draw fuel from the tank. That situation remained through the next day until the valves were ultimately repaired. Because the fuel pumps were inoperable for two days it meant that not only did the fishermen not fuel there those two days, they also did not sell their marine products to SUSA. As a direct result, SUSA lost $1,500 a day in lost income, for a total of $3,000. It was also required to pay Maritime Energy at least $32.50 for repairs.[4]

In finding that Carver tampered with the valve on the defendants' fuel tank, the court acknowledges that while it has accepted his testimony on other points of contention in this case, it does not do so here. The court reaches this factual conclusion because it accepts as true the testimony of Mark Brackett who saw Carver on top of SUSA's tank on the date in question as though he were working on it. The court also accepts Brackett's testimony to the effect that later, when the two men spoke, Carver told him that he had worked for Bill [Atwood] in the past and hadn't been paid, that Atwood would have a problem getting fuel for a while, and that he had done something to a valve.

---

[4] According to the court's trial notes, Maritime Energy's employee was at SUSA for one and a half hours but was paid portal to portal. By the court's familiarity with Knox County, that would add an hour to the bill, assuming the employee came from Rockland. Counsel for the defendants advised the court that Marriner was paid $13 per hour for this job. $13 x 2.5 = $32.50.

5

Moreover, Carver had a motive for harming Atwood's business. He believed Atwood had been unpleasant with his wife, had discharged him from a job and, contrary to Thebeau's assurances, had not paid him for all his work and the material he had delivered. As well, Carver testified that he cannot provide a good reason why he went on top of the tank that day.

So, even though the plaintiff has presented testimony that it would be difficult and time-consuming to tamper with the valve on this tank so that it would stop the flow of fuel, the court finds that the plaintiff intentionally did so. He has considerable expertise in this area, was familiar with the tank, and had more than a few minutes to act.

On March 25, 1999, Atwood's attorney wrote to Carver advising him that he is not to enter on any of Atwood's properties without his express consent. He also told Carver that he has to remove equipment he had stored at SUSA's building by April 20, 1999, by making prior arrangements to do so. The letter further advised Carver that if he failed to remove the equipment, he would be charged $100 per month storage fee and that a lien would be placed on his property to assure payment.

The court finds that the plaintiff and the defendants had a contract for the former to install piping and fuel pump apparati at SUSA's wharf in Tenants Harbor. The contract was on a time and materials basis; that is, SUSA was to pay Carver for the time he devoted to the project and for the materials he delivered.

Although SUSA was interested in having this project move ahead in an orderly way, it imposed no time limits within which the work was to be performed. Instead, the court finds that the delay in performance was the fault of both parties: SUSA's for its failure to install appropriate pipe hangers by the Summer of 1998, Carver's for his

6

commitment to other jobs. In any case, after September of 1998, both parties were in a position to perform but SUSA had elected to terminate the contract.

While SUSA may have had adequate justification to end its relationship with Carver, such an act does not excuse SUSA from paying Carver for the labor he provided and the materials he delivered. In particular, as the defendants have agreed, the plaintiff is entitled to be paid for the work he performed and the materials he provided in February of 1998 which total $3,064.

Thereafter, the plaintiff, at the defendants' behest, delivered $9,063 in materials through the Summer of 1998 and in December of that year. Once delivered, this material became the defendants' property, as it acknowledged via the use of the property as its own by offering it to Adams to use when that company agreed to take over the project. Frustrated in this effort to derive some use of the equipment, SUSA then determined it would turn back to Carver and have him remove the material, even though it was no longer his. Indeed, the defendants have offered no explanation in law nor any evidence to support its position that it did not have to pay Carver for this material or that he was obliged to recover it and remove it from the work site.

From all this, the court concludes that as to count I of the complaint, the plaintiff has established that he had a time and materials contract with the defendants which the latter breached and that the plaintiff was damaged thereby in the total sum of $12,127.

With respect to count II of the complaint which relies on unjust enrichment as the theory of recovery, it must be pointed out that, "[u]njust enrichment describes recovery for the value of the benefit retained when there is no contractual relationship . . ." *Paffhausen v. Balano*, 1998 ME 47, ¶ 6, 708 A.2d 269, 271. Because the court has concluded that the relationship between Carver and SUSA was a contractual one, the

7

breach of which provides a remedy, the principle of unjust enrichment is inapplicable in this case, and judgment cannot be entered for the plaintiff on count II.

As to the counterclaim, the court finds that, based on the factual findings and rationale offered herein which relates to count I of the complaint, the defendants have failed to establish that the plaintiff breached the parties' contract. As noted, the delay in performance can be ascribed to both parties, but that the plaintiff was in a position to perform the work required within a reasonable time after the site was prepared for pipe installation. Moreover, as noted, there was no evidence, other than Atwood's interest in getting this job done, that this was a contract in which "time was of the essence." Accordingly, judgment will be entered for the plaintiff on count I of the counterclaim.[5]

A similar result obtains as to count VI. As discussed, *infra*, the material on which the defendants seek a lien is SUSA's. It purchased the material as part of its contract with the plaintiff and must now pay him for its delivery. It follows, of course, that it may not charge Carver a storage fee for this property, nor may a lien be placed on it for its benefit.

The remaining four counts of the counterclaim, II-V, concern Carver's tampering with the valve on SUSA's new fuel tank. Counts II and IV are entitled, respectively, Common Law Trespass and Trespass to Personal Property. However denominated, these two counts are akin to a trespass to chattel, that is, the intentional misuse of another's personal property via physical contact with that property which results in the loss of use of that property by its rightful possessor. *See* RESTATEMENT (SECOND) OF TORTS, §§ 216-218, 221 (1965). According to this court's factual findings, that is precisely what occurred here and SUSA is entitled to the full measure of damages occasioned by

---

[5] At oral argument, counsel for SUSA agreed that it could not prevail on count I as the parties had a time and materials contract which could have been terminated by either.

8

the impairment to its chattel. *Id.*, § 218, comment g. Such damages amount to $3,032.50 which represents SUSA's lost income from the fuel pump being out of service for two days, and the cost of repairs.

In count V, SUSA asks the court to award it punitive damages, presumably for the plaintiff's intentional tampering with its tank valve. As the court has previously found, Carver intentionally interfered with SUSA's property for the purpose of disrupting its business operations. The motivation to do so was malicious, namely to harm Atwood for the manner in which he treated Carver's wife, for discharging him from this job, and for not paying him for the work he had done. In the court's view, the defendant has established by clear and convincing evidence that these acts by Carver, and his motivations in carrying them out, amount to "express" or "actual" malice. *Tuttle v. Raymond*, 494 A.2d 1353, 1361 (ME. 1985). Accordingly, the court awards the defendants $1,000 in punitive damages.

In arriving at this figure, the court has considered the plaintiff's financial circumstances and finds that the decision to undertake this vandalism was "spur of the moment" rather than a planned attack on SUSA's fuel operations. Last, the harm done to SUSA by Carver's acts was modest and easily repaired. Accordingly, the court concludes that "the degree of reprehensibleness" of Carver's conduct was modest so that the award of punitive damages ought to be modest also. *See Harris v. Soley*, 2000 ME 150, ¶¶ 31-33, 756 A.2d 499, 508-09.

In count III, the defendant asks the court to apply Title 14 M.R.S.A. § 7551-B to the claim concerning Carver's tampering with the fuel tank valve, presumably for the purpose of recovering the special damages authorized by that statute. In the court's view, this law cannot be applied to the facts in this case.

9

The first line of this statute reads, "A person who intentionally enters the land of another *without permission* and causes damage to property is liable to the owner in a civil action . . ." 14 M.R.S.A. § 7551-B(1) (emphasis supplied). One who enters land "in the possession of another without a privilege to do so created by the possessor's consent or otherwise," is a trespasser. *Collomy v. School Administrative Dist. No. 55*, 1998 ME 79, § 6, 710 A.2d 893, 895 (quoting RESTATEMENT (SECOND) OF TORTS, § 329 (1965)). Thus, one who wishes to rely on this statute must first establish that the person who caused damage was a trespasser, that is, one who had no permission or consent to enter.

A business invitee is not a trespasser because the conduct of the possessor would allow the invitee to believe that the possessor is willing to permit this person to enter if he desires to do so. RESTATEMENT (SECOND) OF TORTS, § 332 (1965). Thus, if Carver was a business invitee on February 22, 1999, then he was not trespassing, i.e., entering SUSA's land without permission, and the statute cannot apply.

On that date, Carver entered SUSA's property to inquire about being paid for the work he did there. So, even though his services had been terminated, his visit to SUSA's wharf was on a legitimate business errand as to which he could reasonably believe that his entry would be allowed. This is because Thebeau had told him that he would try to intercede with his boss and get Carver paid. Thus, a visit to Thebeau at this place of business was for a purpose which Carver could reasonably believe would be accepted as it related to the work done there and was "integrally connected" with SUSA's business. *Poulin v. Colby College*, 402 A.2d 846, 849 (Me. 1979). Accordingly, the court must conclude that when Carver entered SUSA's property on this date, he was an

10

invitee and not a trespasser.[6] Indeed, the defendant has presented no evidence or argument to the contrary.

From all this, as noted, the court must conclude that 14 M.R.S.A. § 7551-B is inapplicable to this controversy and the defendants are not to be awarded the special damages authorized by this statute.

## III.   Conclusion.

The clerk is directed to make the following entries:

A.   Judgment is ENTERED for the plaintiff on count I of the complaint and he is AWARDED damages in the sum of $12,127.

B.   Judgment is ENTERED for the defendants on count II of the complaint.

C.   Judgment is ENTERED for the plaintiff (counterclaim defendant) on counts I and VI of the counterclaim.

D.   Judgment is ENTERED for the defendants (counterclaim plaintiffs) on counts II and IV of the counterclaim and they are AWARDED damages in the sum of $3,032.

E.   Judgment is ENTERED for the plaintiff (counterclaim defendant) on count III of the counterclaim.

F.   Judgment is ENTERED for the defendants (counterclaim plaintiffs) on count V of the counterclaim. Punitive damages of $1,000 are AWARDED to the defendants (counterclaim plaintiffs).

So ordered.

Dated: February 10, 2003

John R. Atwood
Justice, Superior Court

---

[6] The statute, 14 M.R.S.A. § 7551-B, is consistent with general tort law which has abandoned the notion of trespass ab initio which would have characterized the lawful entry on land as a trespass if the tortfeasor thereafter commits a tortious act. RESTATEMENT (SECOND) OF TORTS, § 214(2), comment e (1965).

11