2008 ME 164

**Eric D. CAVERS**

v.

**HOUSTON McLANE CO., INC.
d/b/a The Houston Astros
Baseball Club.**

Supreme Judicial Court of Maine.

Argued: Sept. 15, 2008.
Decided: Oct. 30, 2008.

William O. LaCasse, Esq., C. Lindsey Morrill, Esq. (orally), Norman, Hanson & DeTroy, LLC, Portland, ME, for Houston McLane Company.

Patrick M. Kelly, Esq. (orally), McTeague, Higbee, Case, Cohen, Whitney & Toker, P.A., Topsham, ME, for Eric D. Cavers.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

ALEXANDER, J.

[¶ 1] Houston McLane Co., Inc., d/b/a the Houston Astros Baseball Club, a Texas corporation, appeals from a decision of a Workers' Compensation Board hearing officer (*Jerome, HO*) determining that the Board has personal jurisdiction over the Houston Astros on Eric D. Cavers's claim for workers' compensation benefits. The Astros contend that the exercise of personal jurisdiction in this case violates due process because the only contact the Astros had with Maine was a visit by its Director of Scouting to negotiate and sign Cavers's minor league baseball contract. We affirm.

## I. CASE HISTORY

[¶ 2] At all relevant times, Eric Cavers has been a resident of Otisfield. He graduated from Oxford Hills High School. He then attended Franklin Pierce College in New Hampshire on a baseball scholarship. After his third year in college, Cavers attended a try-out sponsored by the Astros

in Albany, New York. He then entered the June 2004 Major League Baseball amateur draft. He was selected by the Astros in the tenth round as the 304th overall selection in the draft. On June 9, the Astros' Director of Scouting came to Cavers' home in Otisfield where he and Cavers negotiated and signed a standard Minor League Uniform Player Contract.

[¶ 3] The contract was for a term of seven baseball seasons and governed all aspects of a player's services on minor league baseball clubs. It also incorporated by reference the agreements and rules applicable to all major league players. The contract obligated the player "to perform professional services on a calendar year basis," although it specified that salary payments would be made only during the playing season. The contract also specified that the player could be required to maintain playing condition and weight while home during the off-season, and that the player would be paid for travel costs from his home to the training site at the start of the training season and to return home at the end of the season, or if released prior to the end of the season.

[¶ 4] The contract obligated the baseball club to pay medical expenses caused by any playing injury and not covered by workers' compensation or medical insurance. The club reserved the right to select the persons performing medical services and the places where such services would be performed.

[¶ 5] The contract specified that the player could be assigned or traded to any other club. Spaces on the contract provided for its assignment from one club to another. The contract also stated that the player could be released at any time the club decided that the player's services were no longer needed.

[¶ 6] The contract included a choice of law provision stating that it "shall be governed by and interpreted in such a manner as to be effective and valid under New York law." It included no provision specifying any jurisdiction or forum as a place for resolution of claims or disputes.

[¶ 7] An addendum to the contract indicated that it was an agreement with the Houston Astros and specified the rates of pay and a signing bonus. The addendum included a space for approval by the Commissioner of Major League Baseball.

[¶ 8] Cavers began to play with the Astros' rookie league team in Greenville, Tennessee, as a catcher. On June 27, 2004, he injured his shoulder during a game when throwing a ball to second base. He traveled to Houston where the team doctor told him he had a strained shoulder and recommended conservative treatment and limited activity. He was put on the disabled list and allowed to practice, but not to play. He remained with the Greenville team until the end of the season. He went to Houston again to see the team doctor, who recommended six more months of rest and rehabilitation.

[¶ 9] As the 2005 season approached, Cavers continued to experience pain. He sought a second opinion from a doctor in Boston, who diagnosed him with a torn labrum, and advised him to undergo arthroscopic surgery. Against the Astros' doctor's advice, Cavers underwent the surgery in March 2005. After a period of recuperation in Maine, Cavers was sent to Florida for rehabilitation. His condition improved, and the Astros assigned him to a team in Troy, New York. After the 2005 season, Cavers went back to college for a semester, and helped coach the Franklin Pierce team. By the 2006 season, after spring training in Florida, Cavers felt he had recovered. He played for another Class A minor league team, the Lexington Ken-

tucky Legends. None of the Astros' teams ever traveled to Maine for games.

[¶ 10] When the 2006 season ended, the Astros released Cavers from his contract. Cavers played for another team in Illinois for a short period, then returned to Maine. He has not played professional baseball since, and is working as a carpenter in Maine. Cavers has received some medical care for his shoulder in Maine.

[¶ 11] Cavers filed a petition for award of workers' compensation benefits and for payment of medical and related services in Maine. Before the Workers' Compensation Board, the Astros moved to dismiss the claim, asserting that Maine lacks personal and subject matter jurisdiction. The hearing officer found that Cavers was a resident of Maine at the time of the injury, and thus, the Board had subject matter jurisdiction over the claim. The hearing officer also determined that the Board had personal jurisdiction over the Astros.

[¶ 12] The hearing officer determined that Cavers was entitled to the protection of the Maine Workers' Compensation Act for the 2004 shoulder injury, but awarded no wage replacement benefits. The petition for payment of medical bills was granted. The Astros filed a petition for additional findings of fact and conclusions of law, which the hearing officer denied. We granted the Astros' petition for appellate review pursuant to M.R.App. P. 23 and 39–A M.R.S. § 322 (2007). The only issue raised by the Astros on appeal is whether the Board has personal jurisdiction over the Astros.

## II. LEGAL ANALYSIS

[¶ 13] Cavers has always maintained his residence in Maine. The Maine residency of an employee, by itself, is sufficient to confer subject matter jurisdiction on the Board over claims for work-related injuries received by the employee out of state. *Christiansen v. Elwin G. Smith, Inc.*, 598 A.2d 176, 177 (Me.1991); *see also LeBlanc v. United Eng'r & Constructors, Inc.*, 584 A.2d 675, 677 (Me.1991); *Dissell v. Trans World Airlines*, 511 A.2d 441, 444 (Me.1986). The Astros do not dispute that Cavers was a Maine resident at the time he was injured.

[¶ 14] The Workers' Compensation Act replaces common law tort jurisdiction for work-related injuries. 39–A M.R.S. §§ 103, 104 (2007). The long-arm statute, 14 M.R.S. § 704–A (2007), and personal jurisdiction due process analysis are appropriately applied to the determination of whether the Workers' Compensation Board has authority over claims against employers arising from injuries that occur in other states to Maine resident employees. *See Christiansen*, 598 A.2d at 177.

[¶ 15] The Maine long-arm statute states, in pertinent part:

Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated in this section, thereby submits such person ... to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of such acts:

A. The transaction of any business within this State.

14 M.R.S. § 704–A(2).

[¶ 16] By negotiating and contracting with Cavers in Maine, the Astros transacted business within the State.

[¶ 17] When there is an issue of judicial or administrative authority over an out-of-state party, personal jurisdiction issues are analyzed according to the due process and minimum contacts standards articulated by the United States Supreme Court in *Shaffer v. Heitner*, 433 U.S. 186,

212, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), and *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Those standards apply to assertions of state court or agency jurisdiction based on either personal contacts or location of property within a state. *See Shaffer,* 433 U.S. at 212, 97 S.Ct. 2569; *Connelly v. Doucette,* 2006 ME 124, ¶¶ 6–7, 909 A.2d 221, 223; *Commerce Bank & Trust Co. v. Dworman,* 2004 ME 142, ¶ 10, 861 A.2d 662, 665. Thus, Maine's long-arm statute, 14 M.R.S. § 704-A, has been held to allow the exercise of jurisdiction over nonresident defendants to the extent authorized by the Due Process Clause of the Maine Constitution, Me. Const. art. I, § 6-A, and that of the United States Constitution, U.S. Const. amend. XIV, § 1. *See Commerce Bank,* 2004 ME 142, ¶ 12, 861 A.2d at 666; *Bickford v. Onslow Mem'l Hosp. Found., Inc.,* 2004 ME 111, ¶ 10, 855 A.2d 1150, 1154–55.

[¶ 18] Due process is satisfied when: "(1) Maine has a legitimate interest in the subject matter of the litigation; (2) the defendant, by his or her conduct, reasonably could have anticipated litigation in Maine; and (3) the exercise of jurisdiction by Maine's courts comports with traditional notions of fair play and substantial justice." *Commerce Bank,* 2004 ME 142, ¶ 14, 861 A.2d at 666; *see also Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154; *Christiansen,* 598 A.2d at 177.

[¶ 19] When the defendant challenges the jurisdiction of the court, "[t]he plaintiff bears the burden of satisfying the first two prongs based on specific facts in the record, after which the burden shifts to the defendant to demonstrate that the exercise of jurisdiction does not comport with traditional notions of fair play and substantial justice." *Bickford,* 2004 ME 111, ¶ 10, 855 A.2d at 1155. The record must be construed in the manner most favorable to the party asserting jurisdiction. *Id.*

[¶ 20] With this background, we address the elements of the three-part test.

A.  Legitimate Interest in the Subject Matter of the Litigation

[¶ 21] "Maine has a legitimate and substantial interest in ensuring that the burden of its residents' [work-related] injuries falls upon their employer rather than upon their communities." *Christiansen,* 598 A.2d at 177 (quotation marks omitted); *see also Harriman v. Demoulas Supermarkets, Inc.,* 518 A.2d 1035, 1036–37 (Me. 1986) ("Maine has an interest in providing . . . Maine citizens [ ] a means of redress against nonresidents. . . . [And] concern for the safety of Maine workers engaged in activities in the course of trade that is essential to Maine's economy." (citations omitted)).

[¶ 22] The hearing officer concluded that Maine has a legitimate and substantial interest in the subject matter of the action because (1) Maine has a legitimate interest in ensuring that the burden of its residents' work-related injuries fall upon the employer and not the community; (2) Cavers was a resident of Maine before, at the time of, and after his injury; and (3) Cavers received some of his medical care for the work-related injury in Maine.

[¶ 23] The Astros do not contest this conclusion. They contend mainly that Cavers did not meet his burden of establishing the second part of the analysis, that the Astros should have reasonably anticipated having to defend a compensation claim in Maine.

B.  Reasonable Anticipation of Litigation in Maine

[¶ 24] The second part of the analysis, whether the employer by its conduct reasonably could have anticipated liti-

gation in Maine, requires an assessment of whether the foreign corporation has sufficient contacts with the forum State to "make it reasonable ... to require the corporation to defend the particular suit which is brought there." *Harriman*, 518 A.2d at 1037 (quoting *Int'l Shoe*, 326 U.S. at 317, 66 S.Ct. 154). The requisite minimum contacts are present when "the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* (quotation marks omitted). A defendant's activities are sufficient to establish minimum contacts when (1) the activities of the defendant have been directed at the forum's residents; (2) the defendant deliberately engages in significant activities in the forum; or (3) the defendant creates continuing obligations between itself and residents of the forum. *Id.*; *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

[¶ 25] In this case, the hearing officer determined that Houston "purposely availed" itself of the privilege of conducting business in Maine when its agent came to Maine to negotiate and execute Cavers's employment contract.[1]

[¶ 26] The reasonable anticipation analysis can be informed by precedent and practice in other jurisdictions. Seventy-three years ago the United States Supreme Court addressed due process—personal jurisdiction issues in a workers' compensation case with minimum contacts facts very similar to this appeal. In *Alaska Packers Ass'n v. Industrial Accident Commission of California*, 294 U.S. 532, 538, 55 S.Ct. 518, 79 L.Ed. 1044 (1935), a person living in California executed an employment contract in California agreeing to work in Alaska during the salmon canning season for specified wages and payment of transportation costs. The employee was injured while working in Alaska. *Id.* at 537, 55 S.Ct. 518. Upon return to California, he filed a workers' compensation claim in California and received a compensation award. *Id.* at 538–39, 55 S.Ct. 518. The employer appealed asserting, among other issues, a due process—personal jurisdiction bar to the employee's claim. *Id.* at 539, 55 S.Ct. 518. The Supreme Court affirmed, rejecting the due process claim. *Id.* at 542, 55 S.Ct. 518. In its holding, the Supreme Court noted that an employment contract that is signed in a state, by a person living in that state,[2] even if it is to be performed elsewhere, puts the obligations of the contract within the reach of the power that the state of residence may constitutionally exercise without violating the due process clause. *Id.* at 540–42, 55 S.Ct. 518.[3]

---

1. Cavers asserted two other bases for a finding of personal jurisdiction. He attempted to establish that a business affiliated with the Houston McLane Company conducts business in Maine, and that the Astros conduct business in the State when Astros items are sold at sports stores. The hearing officer concluded that Cavers did not establish that the Astros do business in Maine on either theory.

2. The opinion described the employee as "a non-resident alien," but treated the employee as if he were a state resident. *Alaska Packers Ass'n v. Indus. Accident Comm'n of Cal.*, 294 U.S. 532, 538, 55 S.Ct. 518, 79 L.Ed. 1044 (1935).

3. The employment contract at issue, unlike Cavers's contract, contained a provision specifying that any claim for workers' compensation should be brought under the Alaska workers' compensation law. *Alaska Packers*, 294 U.S. at 538, 55 S.Ct. 518. The employee filed his claim in California relying on a provision of the California workers' compensation law that provided that any California resident whose employment contract was signed in California could file a claim in California, even for injuries occurring "without the territorial limits of this state." *Id.* at 538, 55 S.Ct. 518 (quotation marks omitted). The Supreme Court approved application of the

[¶ 27] In its opinion, the Supreme Court observed that on the facts before it, a minimum contacts analysis might be insufficient to support exercise of jurisdiction over a tort claim, but the execution of the employment contract in the state, by a resident of the state, distinguished the case from a tort claim and was sufficient to justify exercise of state authority over employment issues, including workers' compensation issues, arising out of the contract. *Id.* at 540–41, 55 S.Ct. 518.

[¶ 28] The *Alaska Packers* precedent has been applied to a workers' compensation claim asserted by a minor league baseball player in a case virtually on all fours with the facts of this appeal. *Bowen v. Workers' Comp. Appeals Bd.*, 73 Cal. App.4th 15, 86 Cal.Rptr.2d 95 (1999).

[¶ 29] In *Bowen*, a California resident was drafted by the Florida Marlins in 1992. *Id.* at 97. Bowen signed the Minor League Uniform Player Contract, with addenda, at his residence in California. The contract had been mailed to Bowen after Bowen had negotiated, by telephone, with a Marlins scout who was also a resident of California. The contract began with the 1993 baseball season. Bowen was initially assigned to a team in Erie, Pennsylvania. He continued playing for Marlins-affiliated minor league teams in 1994, 1995, and 1996, signing contract addenda that were sent by mail to his California residence. Bowen played only for Marlins-affiliated minor league teams in the northeast and in Florida. He never played or trained in

California. In the off-season, he continued to reside in California. *Id.*

[¶ 30] In April 1996, Bowen was injured while pitching in a game in Clearwater, Florida. After a period on the disabled list, Bowen pitched with discomfort for the rest of the 1996 season. He was released by the Marlins at the end of the 1996 season. *Id.*

[¶ 31] Bowen applied for workers' compensation benefits in California. *Id.* at 96. His claim was initially denied by the Workers' Compensation Appeals Board. The Appeals Court reversed, holding that "an employee who is a professional athlete residing in California, such as Bowen, who signs a player's contract in California furnished to the athlete here by an out-of-state team, is entitled to benefits under the act for injuries received while playing out of state under the contract." *Id.* at 104. The Court of Appeals cited *Alaska Packers* in rejecting the Marlins' denial of due process argument that there were insufficient contacts with the state to support exercise of personal jurisdiction. *Id.* at 103–04.

[¶ 32] A more recent California Court of Appeals opinion, *New York Yankees v. Workers' Compensation Appeals Board,* No. D036556, 66 Cal. Comp. Cases 291, 2001 Cal. Wrk. Comp. Lexis 4872, at *9 (Cal.Ct.App. Jan. 23, 2001) reached the same result on a workers' compensation claim filed by a New York Yankees pitcher, who was a resident of California but was injured during spring training in Florida.[4]

California law to allow the claim to proceed in California, despite the provision in the contract, in a discussion that followed review of the due process—personal contacts issue. *Id.* at 543–50, 55 S.Ct. 518.

4. Other cases involving application of workers' compensation laws to injuries arising in the course of employment by professional baseball teams, but without the personal juris-

diction question at issue in this case, include *Bayless v. Philadelphia Nat'l League Club*, 472 F.Supp. 625, 631 (E.D.Pa.1979) *aff'd.*, 615 F.2d 1352 (3d Cir.1980) (holding professional baseball player's exclusive remedy for injury incurred in the course of employment was under the Pennsylvania's Workers' Compensation Act); *United States Fidelity & Guar. Co. v. Indem. Ins. Co. of N. Am.*, 271 F.2d 955,

[¶ 33] The same due process principles have been applied to claims by players recruited to play college sports. In *Barile v. University of Virginia*, 2 Ohio App.3d 233, 441 N.E.2d 608, 616 (1981), the Ohio Court of Appeals held that Ohio courts, without violating due process, had jurisdiction to hear a breach of contract and damages action brought by an Ohio resident who signed a letter of intent in Ohio to play football at the University of Virginia and was subsequently injured while playing football in Virginia. In *Rodwell v. Pro Football, Inc.*, 45 Mich.App. 408, 206 N.W.2d 773, 780 (1973), the Michigan Court of Appeals reached a similar result on a professional football player's workers' compensation claim brought by a Michigan resident against the Washington Redskins.

[¶ 34] The law articulated in these opinions is supported by treatises surveying the law:

> If the defendant is the employer, it may be possible to obtain long-arm jurisdiction for the suit based on an injury incurred out of state, if the plaintiff's employment was the result of the defendant's recruiting activity in the forum state, even though the defendant's operations are conducted elsewhere.

Robert C. Casad and William M. Richman, *Jurisdiction in Civil Actions* § 7-2(2)(e)(vi) (3d ed. Lexis 2004); *see also* Arthur Larson & Lex K. Larson, *Workers' Compensation Law* § 22.04[1][b] (2008).

[¶ 35] Based on the law of personal jurisdiction from 1935 to date, and with recent precedent directly applicable to Major League Baseball, the Astros had sufficient contacts with Maine to have reasonably anticipated a court or administrative action in Maine arising from Cavers's employment contract negotiated and signed in Maine.

C. Traditional Notions of Fair Play and Substantial Justice

■ [¶ 36] The third step of the inquiry is whether the exercise of personal jurisdiction comports with "our traditional conception of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 320, 66 S.Ct. 154. This analysis requires consideration of "a variety of factors including the nature and purpose of defendant's contacts with the forum state, the connection between the contacts and the cause of action, the number of contacts, the interest of the forum state in the controversy, and the convenience and fairness to both parties." *Labbe v. Nissen Corp.*, 404 A.2d 564, 570 (Me.1979).

[¶ 37] Before the three-part test and the fair play and substantial justice issue was fully articulated in *International Shoe*, the Supreme Court had extensively discussed the fairness of applying the workers' compensation law of the state in which a resident had signed an employment contract to injuries received out of state in the employ of an out of state employer in *Alaska Packers*. There it found application of the California Workers' Compensation law to an Alaska injury in the service

956 (5th Cir.1959) (affirming a district court finding that the Texas workers' compensation statute applies to professional baseball player); *Miles v. Montreal Baseball Club*, 379 So.2d 1325, 1326 (Fla.App.1980) (holding that workers' compensation law applied to injuries during off-field events player was obligated to attend, although statute barred application of workers' compensation law to on-field injuries); *Metro. Casualty Ins. Co. of N.Y.* *v. Huhn*, 165 Ga. 667, 142 S.E. 121, 125–26 (1928) (holding a professional baseball player is covered under the state workers' compensation act). The law stated in some of these opinions may have been changed by subsequent statutes. *See* Stephen Cormac Carlin & Christopher M. Fairman, *Squeeze Play: Workers' Compensation and the Professional Athlete*, 12 U. Miami Ent. & Sports L. Rev. 95, 106 n. 65, 107–11 (1995).

of an Alaska employer essentially fair under due process standards. *Alaska Packers*, 294 U.S. at 539–50, 55 S.Ct. 518. The more recent cases cited above support the same result.

[¶ 38] The Minor League Uniform Players Contract does not anticipate or direct that claims or disputes under the contract be brought in any particular jurisdiction or before any particular forum. A player signing such a contract, and the team that signs the player, both may reasonably anticipate that, because the player may travel and the contract may be assigned, the player might play baseball and be injured in most, if not all, of the fifty states, and that claims may arise in any state where the player plays or an injury occurs.

[¶ 39] Major League Baseball and its teams may anticipate actions in any state, and have significant resources to appear and defend such actions. Injured former players, unable to play and released from their contracts, would likely have great difficulty litigating to secure benefits in forums far from their state of residence. As the Supreme Court observed in concluding its due process analysis in *Alaska Packers:*

The probability is slight that injured workmen, once returned to California, would be able to retrace their steps to Alaska, and there successfully prosecute their claims for compensation. Without a remedy in California, they would be remediless, and there was the danger that they might become public charges, both matters of grave public concern to the state.

294 U.S. at 542, 55 S.Ct. 518.

[¶ 40] The same may be said of minor league ball players, released after injury and returned home, far from the team that signed them, to start a new career and get on with their lives. The fair play and substantial justice element of the balancing test favors the acceptance of jurisdiction by the Workers' Compensation Board as consistent with the constitutional requirements of due process.

The entry is:

Decision of the hearing officer of the Workers' Compensation Board affirmed.