2011 ME 24

**ESTATE OF Margarete HOCH**

v.

**John STIFEL et al.**

Supreme Judicial Court of Maine.

Argued: Jan. 11, 2011.
Decided: March 1, 2011.

John S. Whitman, Esq., Heidi J. Hart, Esq. (orally), Richardson, Whitman, Large & Badger, Portland, ME, for John and Gudrun Stifel.

Thimi R. Mina, Esq. (orally), Shaun M. Garry, Esq., McCloskey, Mina & Cunniff, LLC, Portland, ME, for the Estate of Margarete Hoch.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

ALEXANDER, J.

[¶ 1] John and Gudrun Stifel, residents of Germany, appeal from a denial of their motion to dismiss, a default judgment, and a judgment determining damages entered by the Superior Court (Franklin County, *Murphy, J.*) in favor of the Estate of Margarete Hoch. On appeal, the Stifels argue that: (1) the court lacked personal jurisdiction over them pursuant to the long-arm statute, 14 M.R.S. § 704–A (2010), and due process; (2) the court erred in concluding that venue in Franklin County was proper; (3) the court abused its discretion when it entered a default judgment against them for failing to comply with a discovery order; (4) the court erred by admitting evidence at the damages hearing relating to financial transactions occurring after Hoch's death; and (5) the compensatory and punitive damages awards are not supported by sufficient evidence. We modify and affirm the court's judgment.

## I.  CASE HISTORY

[¶ 2]  Margarete Hoch, a medical doctor, was born in Germany in 1924.  She lived and practiced medicine in Franklin County in Maine from 1965 to 2005.[1] Richard and Lorraine Chandler were her friends and unpaid caregivers in Maine for many years.  On December 7, 2001, Hoch executed a durable power of attorney naming the Chandlers as her agents (the Chandler POA).  This power of attorney was recorded on July 25, 2005.  The Chandler POA authorized the Chandlers to manage, control, and handle all of Hoch's business, financial, property, and personal affairs as completely as Hoch would do, including the authority to bring suit on Hoch's behalf.  Hoch also named Richard Chandler as her personal representative in a will dated February 20, 2002.  The Chandlers were not named as devisees in the will.

[¶ 3]  In December 2004, Hoch, then eighty years old, returned to Germany where she took up residency, but she asked the Chandlers to continue to manage her property and substantial assets, much of which remained in the United States.  It was estimated that, in addition to her home and real property, Hoch had money assets and securities in accounts in the United States valued at over $1.8 million and several million euros in money assets in Germany.  At Hoch's request, the Chandlers sold land that Hoch owned in Maine in 2005 and her home in 2007. The proceeds of the sales were deposited into Hoch's accounts in the United States.

[¶ 4]  Hoch communicated with the Chandlers by telephone regularly from December 2004 to August 2006.  Hoch was hospitalized for an injury in or around August 2006.  After she was released from the hospital, because her home was being renovated to accommodate her needs, Hoch took up temporary residency at the Naturhotel, a German hotel and "spa" owned and operated by John and Gudrun Stifel.  Hoch continued to communicate regularly with the Chandlers, but she indicated that she regretted returning to Germany.  At one point, Hoch complained to a family member visiting from Spain that she was not receiving good treatment at the Naturhotel and that she was afraid of John Stifel.  In October 2006, Hoch fled the Naturhotel and was admitted to the hospital for nine days in serious physical condition.  Hoch's distant family attempted to move Hoch to a nursing facility in November 2006, but days before the planned move, Hoch revoked a power of attorney that she had given to her family member only four months earlier.

[¶ 5]  On or around January 25, 2007, just months after arriving at the Naturhotel, Hoch apparently executed a power of attorney, naming Gudrun Stifel as her agent (the Stifel POA).  The Stifel POA, by its terms, would not expire upon Hoch's death.  In April 2007, the Stifels began preventing the Chandlers from reaching Hoch by telephone, and John Stifel called the Chandlers at their home in Maine multiple times to tell them not to attempt to communicate with Hoch. He also instructed them to send documentation concerning Hoch's United States assets to him.

[¶ 6]  In late July 2007, Mary (M.M.) Wagner–Burkhardt, a Kentucky resident, telephoned and then met with the Chandlers in Maine, stating that she was Hoch's "dear friend" and had come to Maine to inspect Hoch's property and obtain information about her Maine assets.  According

---

1.  The findings primarily derive from the complaint.  *See McAlister v. Slosberg,* 658 A.2d 658, 660 (Me.1995) ("When a default is entered against a defendant, the allegations in the plaintiff's complaint are deemed to be true and become findings of fact.").

to a sworn affidavit, Wagner–Burkhardt stated at that meeting in Portland that, in coming to Maine, she was "acting at the behest of John Stifel." Wagner–Burkhardt's request for information was refused because she offered no authority to receive it and made no reference to having or expecting a power of attorney. Two days later, John Stifel faxed a power of attorney executed by Hoch in favor of Wagner–Burkhardt to Hoch's bank in Maine, as well as a document purportedly revoking the Chandler POA. Wagner–Burkhardt apparently later contacted Hoch's bank in Maine to request information on how to liquidate Hoch's account there.

[¶ 7] In August 2007, John Stifel sent letters, one of which Hoch apparently countersigned, to the Chandlers and to the Chandlers' attorney, offering them the proceeds from the sale of Hoch's Maine home, estimated at $130,000, to "resolve this situation now and without using the Courts," indicating that the Chandlers should relinquish their power of attorney. The letters stated that, if the compensation offered is "too low," the Chandlers should inform Hoch of this "via Fax," but that "a Court battle" was to be avoided.

[¶ 8] In September 2007, the Chandlers made an unannounced visit to Germany to check on their friend. Despite Gudrun Stifel's attempt to prevent their seeing Hoch, the Chandlers located her room and found Hoch bedridden with bruises and severe bedsores, moaning and in pain, extremely thin, dehydrated, and filthy, with the telephone beyond her reach. The Chandlers accompanied Hoch to the hospital at her request, where she remained for several days because she required surgery for her bedsores and treatment for severe dehydration.

[¶ 9] Hoch indicated to the Chandlers at that time that, although the signatures on the Wagner–Burkhardt POA and the revocation of the Chandler POA were hers, she wanted everything to "stay the same" in the United States. Hoch also stated that she had never met Wagner–Burkhardt and did not know who she was. Before the Chandlers left Germany, Hoch indicated that she wanted to return to the United States for medical treatment. The Chandlers began to make arrangements for Hoch's return, but the Chandlers were unable to contact Hoch after they returned to Maine, except for one call monitored by the Stifels. In October 2007, Hoch placed two phone calls to her bank in Maine. In these calls, Hoch was apparently on a speakerphone with others in the room who were instructing Hoch on what to say.

[¶ 10] The Chandlers, acting on behalf of Hoch pursuant to the power of attorney, filed a complaint for injunctive relief (Count VII) and a declaratory judgment (Count I) against the Stifels on October 10, 2007.[2] The complaint also alleged various torts—fraud (Count II), undue influence/constructive trust (Count III), tortious interference with economic advantage (Count IV), intentional infliction of emotional distress (Count V), and civil conspiracy (Count VI). These counts asserted, among other things, that the Stifels conspired to use fraud and undue influence to secure the Stifel POA; to revoke the Chandler POA; to extract or secure from Hoch valuable legal instruments, money assets, and property; and to interfere with Hoch's longstanding contractual or fiduciary relationships with Hoch's banking institution in Maine and with the Chandlers.

[¶ 11] The Chandlers sought an ex parte temporary restraining order (TRO)

---

2. The Chandlers also named Wagner–Burkhardt as a defendant, but she was dismissed without prejudice from the matter on February 17, 2009.

the same day, seeking to prevent dissipation of Hoch's money and assets and end the intimidation and abuse of Hoch by the Stifels. The court (*Jabar, J.*) granted the TRO request the following day, finding, among other things, that: (1) the Chandler POA was valid and in force and no purported revocation thereof was valid; and (2) any power of attorney from Hoch to the Stifels or Wagner–Burkhardt was invalid and had no legal effect in Maine.

[¶ 12] On December 10, 2007, the Stifels moved to dismiss the action for lack of personal and subject matter jurisdiction, improper venue/forum non conveniens, failure to join Hoch as an indispensable party, and lack of the Chandlers' standing to bring suit.[3] After a hearing, the court (*Murphy, J.*) denied the Stifels' motion to dismiss in a thorough written order dated February 14, 2008. Hoch's subsequent motion to intervene was granted, but her motions to dissolve the TRO and dismiss the action were denied. The Stifels then filed numerous pleadings in court, including a late answer to the Chandlers' complaint[4] and an unsuccessful motion for summary judgment. The Stifels' answer did not assert lack of personal jurisdiction as an affirmative defense.

[¶ 13] On February 29 and April 14, 2008, the court entered an order and an amended order, respectively, modifying the TRO. These orders required all parties, including Hoch, to disclose under oath to the court and each other all information and documents in their possession relating to Hoch's money, assets, property, estate planning, and debts/obligations in the United States and Germany for all dates beginning January 1, 2006. The Stifels

conceded through their American counsel that the court had the authority to order disclosure of this information and that they would consent to it. Subsequently, the Stifels sought an extension to comply with this order, which the court granted.

[¶ 14] On or about March 25, 2008, the Chandlers served document requests on the Stifels seeking many of the same documents as required under the court's orders amending the TRO. German counsel, who was purportedly representing Hoch, instructed Hoch to tell the Stifels not to comply with the court's orders for disclosure or with the request for discovery, asserting that the court lacked jurisdiction and that disclosure of estate planning violated German law. The record indicates that the Chandlers initiated proceedings in German courts to appoint a guardian, which the Stifels opposed.

[¶ 15] When the Stifels failed to disclose the documents that were the subject of the March/April 2008 orders, the Chandlers filed a motion for contempt on which a hearing was held May 30, 2008. The Stifels failed to appear for the hearing, although their local counsel appeared. The court entered a default against the Stifels on the contempt motion for failure to appear, and the Chandlers moved for monetary sanctions and a default judgment in the case based on the Stifels' default on the motion for contempt. The court requested written argument on the motion for default judgment, but the Stifels provided none. On June 18, 2008, the court entered an order to compel discovery pursuant to the Chandlers' March 2008, request for discovery. The Stifels failed to comply with the order to compel discovery.

---

3. On February 12, 2008, Hoch filed a complaint against the Chandlers and her banks in Maine, which case was consolidated with the instant lawsuit. The court dismissed Hoch's complaint with prejudice on May 29, 2009.

4. The Stifels had been defaulted for failure to file a timely answer, but the court set aside the default and enlarged time to file an answer.

[¶ 16] Hoch died on June 24, 2008.[5] After her death, the Chandlers learned that Hoch had executed a German will (dated August 22, 2007) that estimated her estate to be three million euros after the payment of obligations and named the Stifels as her sole heirs, subject to certain bequests. At the time of execution of that will, Hoch would have been a resident at the Stifels' facility for no more than a year. There is no indication in the record that the Stifels had any relationship with Hoch prior to her coming to reside at their facility.

[¶ 17] On July 10, 2008, the court entered a written order on the Chandlers' motion for contempt and sanctions for discovery violations. The court ordered that (1) the Stifels were defaulted on the motion for contempt and had until August 1, 2008, to cure the default by complying; and (2) they were defaulted on all counts of the Chandlers' complaint against them pursuant to M.R. Civ. P. 37(b)(2)(C) for failure to comply with the order compelling discovery. The Stifels subsequently provided certain limited information and documents in response to the court's order for an accounting, which the court deemed inadequate.

[¶ 18] On August 8, 2008, having previously entered a default against the Stifels, the court entered final judgment in favor of the Chandlers on Counts I and VII for declaratory judgment and injunctive relief; affirmed the prior entry of default against the Stifels as to the remaining counts; and scheduled a hearing on damages as to those counts, which was held on July 31, 2009. The Stifels filed a motion in limine, requesting that the court exclude from its determination of damages all evidence of money or property transfers occurring af-

ter June 24, 2008, the date on which Hoch died. The court denied the motion in limine in a written order.

[¶ 19] After hearing, the court entered a final judgment on September 25, 2009. In the judgment, the court found that Richard Chandler, as the Estate's personal representative, proved damages and ordered $3,941,756 in compensatory damages for tortious conduct as to Counts II, IV, and VI of the complaint, including $1 as to count V for intentional infliction of emotional distress. The court also granted the Chandlers' request on Count III to create a constructive trust in favor of the Estate and against the Stifels in the amount of $3,941,756. Finally, finding express and implied malice by clear and convincing evidence, the court awarded the Estate $3,000,000 in punitive damages on Counts II, IV, V, and VI, plus interest and costs. The Stifels brought this appeal.

## II. LEGAL ANALYSIS

[¶ 20] We address each of the Stifels' five points on appeal, relating to personal jurisdiction, improper venue, entry of a default judgment, compensatory damages, and punitive damages, in turn.

### A. Personal Jurisdiction

[¶ 21] The Stifels argue that the court erred in concluding that they are subject to the jurisdiction of Maine courts because the statutory criteria of Maine's long-arm statute, 14 M.R.S. § 704-A, and the requirements of due process were not met. We review de novo whether personal jurisdiction exists. *Penkul v. Matarazzo*, 2009 ME 113, ¶ 11, 983 A.2d 375, 378. "Personal jurisdiction has statutory and constitutional aspects that must be satis-

---

**5.** Richard Chandler was substituted after Hoch's death as the plaintiff in this case in his capacity as the special administrator of Hoch's estate, and later, as the Estate's personal representative.

fied before a nonresident defendant with sufficient contacts to the forum state can be forced to defend a suit within that state." *Id.* ¶ 11 n. 3, 983 A.2d at 378.

### 1. The Long–Arm Statute

[¶ 22] Maine's long-arm statute, 14 M.R.S. § 704–A(1), (2), applicable "to the fullest extent permitted by the due process clause of the United States Constitution, 14th amendment," provides in pertinent part:

> Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated in this section, thereby submits such person, and, if an individual, his personal representative, to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of such acts:
>
> **A.** The transaction of any business within this State;
>
> **B.** Doing or causing a tortious act to be done, or causing the consequences of a tortious act to occur within this State; [or]
>
> . . . .
>
> **I.** Maintain any other relation to the State or to persons or property which affords a basis for the exercise of jurisdiction by the courts of this State consistent with the Constitution of the United States.

[¶ 23] Hoch had substantial property in Maine that was subject to control by Maine residents pursuant to the Chandler POA. John Stifel, acting in concert with Gudrun Stifel, called the Chandlers in Maine twice seeking to prevent their contacting Hoch in furtherance of the Stifels' plan to extract valuable legal instruments, money assets, and property in Maine from Hoch. They sent the Chandlers and their attorney letters offering payment out of Hoch's assets, held in one of Hoch's United States bank accounts, in apparent exchange for the Chandlers' relinquishing their POA and settling matters out of court. They faxed the Wagner–Burkhardt POA and the revocation of the Chandler POA to Hoch's Maine bank, events that occurred in Maine and which gave rise to the Chandlers' claim (Count IV of the complaint) of tortious interference with economic advantage. Finally, the Stifels' agent, Wagner–Burkhardt, traveled to Maine to gain information about and access to Hoch's Maine money and property.

[¶ 24] The requirements to assert jurisdiction pursuant to Maine's long-arm statute, section 704–A(2)(A) or (B) are met. Alternatively, the requirements of Maine's long-arm statute are met pursuant to section 704–A(2)(I). *See Dorf v. Complastik Corp.,* 1999 ME 133, ¶ 9, 735 A.2d 984, 988 (holding that, because the jurisdictional reach of Maine's long-arm statute is coextensive with the permissible exercise of personal jurisdiction under the due process clause, "a court need only consider whether due process requirements have been satisfied.")

### 2. Due Process Requirements

■ [¶ 25] "When there is an issue of judicial . . . authority over an out-of-state party, personal jurisdiction issues are analyzed according to the due process and minimum contacts standards articulated by the United States Supreme Court in *Shaffer v. Heitner,* 433 U.S. 186, 212, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), and *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)." *Cavers v. Houston McLane Co.,* 2008 ME 164, ¶ 17, 958 A.2d 905, 909–10 (analyzing personal jurisdiction under due process requirements after applying 14 M.R.S. § 704–A(2)). Due process is satisfied when: (1) Maine has a legitimate interest in the subject matter of the litigation; (2)

the defendant, by his or her conduct, reasonably could have anticipated litigation in Maine; and (3) the exercise of jurisdiction by Maine's courts comports with traditional notions of fair play and substantial justice. *Id.* ¶ 18, 958 A.2d at 910. The Chandlers bore the burden of satisfying the first two elements of the test "based on specific facts in the record"; the burden shifted to the Stifels to demonstrate the negative as to the third element, the record being read most favorably to the Chandlers as the party asserting jurisdiction. *See id.* ¶ 19, 958 A.2d at 910.

■ [¶ 26] The analysis in this case is straightforward. First, Maine has a legitimate interest in the subject matter of the litigation. It has an interest in providing a forum to protect the interests of Hoch, a forty-year resident of Maine; to protect her substantial assets remaining in Maine; to litigate tortious conduct occurring in Maine and tortious conduct that affected Hoch and/or her property in Maine; and to enforce legal documents properly executed in Maine, specifically the Chandler POA. Additionally, significant witnesses and records are located in Maine. *See Connelly v. Doucette*, 2006 ME 124, ¶ 8, 909 A.2d 221, 223–24 (holding that, in addition to providing a forum for its citizens, Maine has a legitimate interest in the subject matter of the litigation when one of its residents "felt the effects" here of an injury occurring out-of-state here and witnesses and records were located here).

■ [¶ 27] Second, the Stifels could reasonably anticipate litigation in Maine because they had sufficient contacts with Maine to make it reasonable to require them to defend themselves here. *See Cavers*, 2008 ME 164, ¶ 24, 958 A.2d at 911. The requisite minimum contacts are present "when the defendant purposefully directs his or her activities at Maine residents or creates continuing obligations between himself or herself and the residents of Maine." *Connelly*, 2006 ME 124, ¶ 9, 909 A.2d at 224. The Stifels purposefully directed their activities at Maine residents and institutions in all of the ways discussed above with respect to the application of Maine's long-arm statute.

■ [¶ 28] Third, the Stifels did not meet their burden of demonstrating that personal jurisdiction over them in Maine does not comport with traditional concepts of fair play and substantial justice. "This analysis requires consideration of a variety of factors including the nature and purpose of defendant's contacts with [Maine], the connection between the contacts and the cause of action, the number of contacts, the interest of [Maine] in the controversy, and the convenience and fairness to both parties." *Cavers*, 2008 ME 164, ¶ 36, 958 A.2d at 913.

[¶ 29] The court did not err as a matter of law in determining that Maine acquired personal jurisdiction over the Stifels, particularly considering their efforts to invalidate a Maine POA and gain control of approximately $2,000,000 in assets located in Maine.[6]

B. Improper Venue

■ [¶ 30] The Stifels argue that venue in Franklin County was not proper pursuant to 14 M.R.S. § 501 (2010), although their argument appears to be part of their challenge to personal jurisdiction rather than to improper venue. The Stifels' argument concerning improper venue is deemed waived and unpreserved for appeal. *See Powers v. Planned Parenthood*

6. Having decided the issue, we need not consider whether, by filing an answer and failing to include lack of personal jurisdiction as an affirmative defense, the Stifels waived or abandoned any challenge based on personal jurisdiction.

*of N. New Eng.,* 677 A.2d 534, 538 (Me. 1996) ("Improper venue is an objection that can be waived."). Although the Stifels used the phrase "improper venue" in their motion to dismiss before the Superior Court, their motion and their reply to the Chandlers' opposition to their motion indicated that they were challenging venue based only on a forum non conveniens claim, which is the basis upon which the court ruled. We do not address the Stifels' improper venue argument further. *See Teel v. Colson,* 396 A.2d 529, 533–34 (Me.1979) (stating that an issue raised for the first time on appeal is deemed waived, stating also that it "is a well settled universal rule of appellate procedure that a case will not be reviewed by an appellate court on a theory different from that on which it was tried ...."); *see also Powers,* 677 A.2d at 538 (holding that the party waived an objection based on improper venue pursuant to section 501 because it characterized the issue as one of subject matter jurisdiction and never cited 14 M.R.S. § 501 in its motion to dismiss).

C. Entry of Default Judgment

■ [¶ 31] The Stifels assert that the court abused its discretion when it entered its default judgment based on their noncompliance with an order compelling discovery because they were following Hoch's wishes and the advice of a German attorney who they claimed was representing Hoch and who allegedly advised them that complying with the court's discovery order would expose them to legal consequences in Germany.

■ [¶ 32] The court entered a default judgment against the Stifels pursuant to M.R. Civ. P. 37(b)(2)(C), which provides:

> If a party ... fails to obey an order to provide or permit discovery, including an order made under Rule 26(g), Rule 35 or subdivision (a) of this rule, the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:.... (C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party.

We review a trial court's imposition of sanctions for discovery violations for an abuse of discretion, and although we do "not lightly overrule the trial court's decision," we "more closely scrutinize sanctions such as dismissal or default." *Douglas v. Martel,* 2003 ME 132, ¶ 4, 835 A.2d 1099, 1100; *Harris v. Soley,* 2000 ME 150, ¶ 9, 756 A.2d 499, 504.

■ [¶ 33] The factors to be weighed when reviewing trial court imposition of sanctions for discovery violations include, but are not limited to: (1) the purpose of the specific rule at issue; (2) the party's conduct throughout the proceedings; (3) the party's basis for its failure to comply; (4) prejudice to other parties; and (5) the need for the orderly administration of justice. *Harris,* 2000 ME 150, ¶ 10, 756 A.2d at 504–05; *Baker's Table, Inc. v. City of Portland,* 2000 ME 7, ¶ 17, 743 A.2d 237, 243. The court should also consider the purpose to be served by imposing sanctions, including penalizing the noncompliant party and deterring similar conduct. *Harris,* 2000 ME 150, ¶ 10, 756 A.2d at 505. The trial court "need not find willfulness, bad faith, or fault in order to justify a sanction such as dismissal." *Id.* ¶ 10 n. 10, 756 A.2d at 505. The trial court is not required to warn a party that noncompliance with discovery rules could result in entry of a default judgment because Rule 37 provides "ample warning."

*Id.* ¶ 8 n. 8, 756 A.2d at 504.[7]

■ [¶ 34] "When the court has determined the facts without error and has understood the factors and law material to the decision at hand," we will defer "to the trial court and will find an abuse of discretion only where the court makes a serious mistake in weighing the applicable factors." *Id.* ¶ 11, 756 A.2d at 505. Here, the trial court entered a comprehensive order explaining its reasoning for entering a default judgment against the Stifels that discusses the factors listed above and provides support from the record for its findings and conclusions.

[¶ 35] The record demonstrates that the Stifels essentially stonewalled discovery efforts and employed tactics to impede the administration of justice through their noncompliance with discovery rules intended to "eliminate the sporting theory of justice and to enforce full disclosure between the parties." *Douglas,* 2003 ME 132, ¶ 6, 835 A.2d at 1100. The Stifels' basis for failing to comply with the discovery order, i.e., the letter from Hoch's attorney, is unpersuasive; German counsel cites little authority for the legal opinion (rendered to Hoch, not the Stifels), and the opinion suggests only that it would be problematic to disclose Hoch's estate planning documents. It does not express an opinion as to the other documents at issue in the discovery order. Further, after Hoch died, the Stifels subsequently disclosed some documents in an apparent eleventh-hour attempt to avoid the contempt finding. The prejudice to other parties resulting from the Stifels' noncompliance with court-ordered discovery is self-evident. Finally, the orderly administration of justice was particularly important in this case, given Hoch's age and poor

health and the need to act expeditiously to protect her and her assets.

[¶ 36] The court did not abuse its discretion in determining that this was "the rare case that requires the ultimate sanction" of entering a default judgment pursuant to M.R. Civ. P. 37(b)(2)(C). *See generally Harris,* 2000 ME 150, ¶¶ 8–18, 756 A.2d at 504–06 (affirming entry of default judgment as a sanction for discovery violations).

### D. Compensatory Damages

[¶ 37] The Stifels argue that the court erred as a matter of law in denying their motion in limine and admitting and considering evidence of financial transactions— debits from Hoch's accounts, transfers of her account balances, and the disposition of her property pursuant to the will Hoch executed in Germany—that occurred after Hoch's death. The Stifels argue that these damages are irrelevant to the claims brought before her death, a probate court had exclusive jurisdiction to determine the validity of Hoch's will, and, as a purely jurisdictional matter, the court could not apply Maine law to affect foreign assets of a foreign citizen. The Stifels also argue that evidence admitted at the damages hearing of debits from Hoch's German accounts occurring before her death was insufficient to support the award, because they were too speculative to support a finding of damages. Finally, the Stifels assert in a footnote with almost no discussion that the court had no jurisdiction to impose a constructive trust equivalent to the amount of the compensatory damages award over assets located in Germany.

[¶ 38] In reviewing the court's compensatory damages award, we apply Maine law, as we do with the court's punitive damages award discussed below. We do

---

**7.** The Stifels received fair warning that default would be sought through the Chandlers' motions for contempt and to enforce discovery.

not discern from the record that the Stifels raised an argument based on choice of law principles to the trial court, i.e., whether German law or Maine law should apply to the issue of compensatory (or punitive) damages, but even if they had, the Stifels raise no such argument on appeal. We therefore consider any choice of law argument to be waived and continue to apply Maine law. *See Holland v. Sebunya*, 2000 ME 160, ¶ 9 n. 6, 759 A.2d 205, 209 (issues not raised or briefed on appeal are deemed abandoned or unpreserved); *Teel*, 396 A.2d at 533 (an issue not raised before the trial court is not properly preserved for appeal); *see also Morof v. United Mo. Bank*, 391 Fed.Appx. 534, 536–67 (6th Cir. 2010) (holding that, because the trial court applied Michigan law rather than Missouri law and the parties never disputed its applicability before the trial court or on appeal, the choice of law issue was waived and the appellate court would continue to apply Michigan law).

1. Admissibility of Post–Death Transfers in Determining Compensatory Damages

■■■ [¶ 39] The court's decision to admit evidence of damages is reviewed for abuse of discretion and clear error. *See Bard v. Lord*, 2010 ME 48, ¶ 8, 997 A.2d 101, 103; *see also State v. Rickett*, 2009 ME 22, ¶ 9, 967 A.2d 671, 674 (reviewing the trial court's denial of a motion in limine for an abuse of discretion and its legal conclusions de novo).

[¶ 40] The court did not err as a matter of law, commit clear error, or abuse its discretion in denying the Stifels' motion in limine and admitting evidence of financial transactions occurring after Hoch's death to calculate the damage award in this case.

■■ [¶ 41] "Tort damages, with the exception of punitive damages, are intended to make the plaintiff whole by compen-

sating him or her for any injuries or losses proximately caused by the defendant." *Reardon v. Lovely Dev., Inc.*, 2004 ME 74, ¶ 9, 852 A.2d 66, 69. The Chandlers originally filed the complaint by virtue of their authority under the Chandler POA to protect Hoch's interests, and Richard Chandler continued prosecution of the matter as the special administrator and personal representative of Hoch's estate after her death.

[¶ 42] The Chandlers' complaint broadly sought damages for the Stifels' tortious conduct, resulting in their exercise of undue influence in securing the Stifel POA and the revocation of the Chandler POA for the purpose of converting Hoch's money assets and property, and in causing Hoch to relinquish or transfer to them "valuable legal instruments, money assets and property." By virtue of the tortious actions they took before Hoch's death, actions which have been established as fact by their default, the Stifels proximately caused damage to Hoch before her death and to her estate after her death. Accordingly, the court did not err as a matter of law in admitting evidence of transfers occurring "by operation of law" under Hoch's German will or other post-death transfers. *See, e.g., Theriault v. Burnham*, 2010 ME 82, ¶¶ 5 n. 1, 11, 2 A.3d 324, 325, 327 (distinguishing between will contests seeking to set aside an entire will in probate court and a civil tort alleging undue influence over the making or revising of a will and seeking only monetary damages, observing that damages awarded in that case were equivalent to the value of the property bequeathed to the defendant as a result of undue influence).

2. Sufficiency of the Evidence

■■ [¶ 43] Our review of compensatory damage awards, the assessment of which is in the sole province of the fact-

finder, is "highly deferential." *Rutland v. Mullen,* 2002 ME 98, ¶ 20, 798 A.2d 1104, 1112. We will disturb an award of damages "only when it is plain that there is no rational basis upon which the amount of the award may be supported, that is, when there is no competent evidence in the record to support the award." *Id.* Damages that are "uncertain, contingent, or speculative" are not recoverable. *Wood v. Bell,* 2006 ME 98, ¶ 21, 902 A.2d 843, 851. "[S]ome evidence of the amount of the loss sustained must support an award," but "damages need not be proved to a mathematical certainty." *Reardon,* 2004 ME 74, ¶ 8, 852 A.2d at 69; *see also Foss v. Ingeneri,* 561 A.2d 498, 498–99 (Me.1989) (holding that plaintiff retains the burden of proving damages by a preponderance of the evidence following entry of default judgment); *Decesere v. Thayer,* 468 A.2d 597, 598 (Me.1983) ("Damages must be grounded on established positive facts or on evidence from which their existence and amount may be determined to a probability."). The fact-finder may also "act upon probable and inferential ... proof in determining damages." *Tang of the Sea, Inc. v. Bayley's Quality Seafoods, Inc.,* 1998 ME 264, ¶ 10, 721 A.2d 648, 650.

[¶ 44] The Chandlers submitted the following evidence in support of their claim of compensatory damages:

a. Bank records that the Stifels admitted were true and genuine, and summaries thereof (as supported by testimonial evidence), showed debits from two of Hoch's German bank accounts from the period October 11, 2006, through June 24, 2008, the date on which Hoch died, totaling 177,-631.76 euros. The Chandlers identified the payee in each transaction, excluding payments that were identified as reasonable compensation to the Naturhotel for Hoch's room and board and payment for her necessary medical care. We observe that two of these debits, totaling 2,325.06 euros, were made by or to Gudrun Stifel in late 2006. Although these debits occurred before the Stifel POA was executed on January 25, 2007, they occurred well after Hoch was under the exclusive care and control of the Stifels. Based on the allegations of the complaint, deemed to be adjudicated fact following entry of the default judgment, we cannot conclude that the court clearly erred in including them in its compensatory damages calculation.

[¶ 45] An additional 54,433.08 euros was debited from one of these accounts after Hoch's death, presumably by virtue of the Stifel POA, given these were debits.

b. Bank records that the Stifels admitted were true and genuine, and summaries thereof (as supported by testimonial evidence), showed transfers out of three of Hoch's accounts and corresponding amounts being transferred contemporaneously into accounts owned by the Stifels a month after Hoch's death. The total amounts transferred were 265,701.87 euros.

c. Bank records that the Stifels admitted were true and genuine, and summaries thereof (as supported by testimonial evidence), showing the value in May 2008 of Hoch's brokerage account at 2,184,694.15 euros. The evidence further shows that two brokerage accounts owned by the Stifels as of mid-August 2008 were valued at 2,048,032.93 euros. The Stifels admitted that the assets held in Hoch's brokerage account were transferred to the Stifels "by operation of law" pursuant to Hoch's will. The Chandlers met their burden of showing damages due to the transfer of Hoch's brokerage account assets, valued somewhere between 2,184,694.15 euros and 2,048,032.93 euros. However, the record does not show on what date the transfers occurred or what the value of Hoch's account was on that date. The

trial court included 2,184,694.15 euros, the value of Hoch's account as of mid-May 2008, in its compensatory damages calculation. We conclude, however, that valuing damages based on the mid-May 2008 valuation date was speculative and that the better measure of damages in this instance is the mid-August valuation of 2,048,032.93 euros.[8]

d. The Stifels admitted that Hoch's German home, which they themselves valued at 80,000 euros, was transferred to them "by operation of law" under Hoch's German will. A property owner is competent to value his own property, and therefore, competent record evidence supports the inclusion of 80,000 euros in the compensatory damages award.

[¶ 46] Accepting the Chandlers' position that these debits or transfers were unauthorized, pursuant to the adjudicated facts in the case and the determination of the Stifels' liability, and were proximately caused by the Stifels' tortious conduct, the record supports the court's determination of compensatory damages with one exception: damages resulting from the transfer of Hoch's brokerage account assets should be 2,048,032.93 euros rather than 2,184,694.15 euros.

[¶ 47] The total is thus:

| | |
|---|---|
| Pre- and Post–Death Debits from Hoch's Bank Accounts | 232,064.84 euros |
| Post–Death transfers from Hoch's accounts into the Stifels' accounts | 265,701.87 euros |
| Value of assets transferred from Hoch's brokerage account | 2,048,032.93 euros |
| Value of Hoch's German Home | 80,000 euros |
| TOTAL | 2,625,799.64 euros |

[¶ 48] Applying the exchange rate accepted at trial of $1.4269 per euro, the record supports a compensatory damages award of $3,746,753.50.

### 3. Imposition of a Constructive Trust

[¶ 49] The Stifels assert in a footnote that the trial court was without jurisdiction to order the imposition of a constructive trust on Hoch's assets transferred to the Stifels and located in Germany, citing to a case pertaining to the imposition of liens on property in another state. We do not view the issue as one of jurisdictional defect. As a court of general jurisdiction, the Superior Court has jurisdiction to grant equitable relief, such as the imposition of a constructive trust. *See* 4 M.R.S. § 105 (2010); 14 M.R.S. § 6051 (2010); *Cassidy v. Cassidy*, 2009 ME 105, ¶ 8, 982 A.2d 326, 329 ("A constructive trust may be imposed to do equity and to prevent unjust enrichment when title to property is acquired by fraud, duress, or undue influence. . . .").

[¶ 50] Based on the few cases we have found relating to this issue, it appears that an American court may grant equitable relief in the form of a constructive trust over assets located in a foreign country. *See, e.g., Watkins v. Watkins*, 160 Tenn. 1, 22 S.W.2d 1, 2 (1929) ("It is settled by the great weight of authority that a court of equity of one state or country, having personal jurisdiction of the necessary parties, and therefore the power to compel a conveyance, may declare and enforce a trust," including a constructive

---

8. We take judicial notice of the fact that there was a significant and well-documented decline in the world financial markets beginning before and continuing after May 2008. Therefore, the August 2008 valuation more accurately states the value of the account for purposes of this litigation.

trust, "relating to real property in another state or country.").

[¶ 51] Some courts have concluded, however, that there are other reasons, such as considerations of comity, not to impose a constructive trust over assets in a foreign country. In *Remington Rand Corp. v. Business Systems, Inc.*, 830 F.2d 1260, 1269–70 (3rd Cir.1987), the appellate court affirmed an order, stating that it imposed, in effect, a constructive trust, that ordered that documents held by a company in The Netherlands were to be turned over to a United States company. The court, however, vacated the trial court's imposition of a constructive trust on other of defendant corporation's assets located outside the territorial limits of the United States, not because the court had no jurisdiction to do so, but because the court's award of equitable relief violated principles of international comity in that case. *Id.* at 1270, 1272–74. In that case, the corporate defendant was undergoing bankruptcy proceedings in The Netherlands. *Id.* at 1262. The appellate court stated:

> Although the constructive trust arrangement would provide additional security for a judgment that [the U.S. plaintiff] was expected to secure, it did so at the expense of dooming any chance of rehabilitating the debtor and, in the event of liquidation, of giving priority to [the U.S. plaintiff] over other ... creditors. We believe that such an expansive and far-reaching order has the capacity to disregard the underlying reasons for comity, to interfere with the orderly administration of bankruptcy in The Netherlands,

and to provoke a confrontation between the courts of the two countries.

*Id.* at 1272. The court instead held that, before it could sustain the imposition of a constructive trust over assets held outside the United States, the United States plaintiff must first determine whether the Dutch bankruptcy court would enforce the plaintiff's judgment for damages; if the Dutch court "fail[ed] to accord the district court's judgment proper respect, the district court [would then be] free to reconsider a proper remedy." *Id.* at 1272–73.

[¶ 52] Due, perhaps, to the Stifels' inadequate briefing on the issue, we have before us no reason to vacate the court's imposition of a constructive trust and affirm that portion of the judgment. Whether a German court will enforce that aspect of the judgment is an issue outside our reach.

### E. Punitive Damages

[¶ 53] The Stifels argue that there was no evidence to support the court's $3,000,000 punitive damages award, particularly no evidence to support the Stifels' ability to pay such an amount. Because the Stifels do not challenge the court's finding, by clear and convincing evidence, of actual or implied malice sufficient to justify punitive damages,[9] we presume that they concede that the court did not err in awarding punitive damages, only that the amount awarded was excessive under Maine common law. *See Tuttle v. Raymond*, 494 A.2d 1353, 1361–63 (Me. 1985).[10] A plaintiff need not present evidence of a defendant's financial circum-

---

9. Even if the Stifels did not concede this point, the record, established by default, demonstrates by clear and convincing evidence that the Stifels acted with implied or express malice in their tortious actions towards Hoch and her interests. *See Tuttle v. Raymond,* 494 A.2d 1353, 1361–63 (Me.1985).

10. Punitive damages may be awarded on a default if the elements of those damages are adequately pleaded in the complaint on which the default is entered. *See McAlister,* 658 A.2d at 660.

stances for a fact-finder to consider an award of punitive damages. *Ferrell v. Cox,* 617 A.2d 1003, 1008 (Me.1992).

[¶ 54] We review a claim that the amount of punitive damages awarded is excessive for an abuse of discretion, considering: (1) the reprehensibleness of the conduct; (2) the amount awarded in relationship to the harm; and (3) the amount compared with sanctions imposed for similar behavior. *Shrader–Miller v. Miller,* 2004 ME 117, ¶ 22, 855 A.2d 1139, 1145; *Harris,* 2000 ME 150, ¶ 31, 756 A.2d at 508. Though not "open-ended," the fact-finder has "considerable discretion in determining the appropriate amount of a punitive damages award." *Harris,* 2000 ME 150, ¶ 30 n. 17, 756 A.2d at 508.

[¶ 55] In reviewing a punitive damages award, we also consider mitigating circumstances, including the financial situation of the liable party, although there is no constitutional requirement that the defendant's wealth be considered. *Shrader–Miller,* 2004 ME 117, ¶ 22, 855 A.2d at 1145; *Harris,* 2000 ME 150, ¶ 35 n. 23, 756 A.2d at 510; *Ferrell,* 617 A.2d at 1008; *Hanover Ins. Co. v. Hayward,* 464 A.2d 156, 158 (Me.1983). Other mitigating factors include the defendant's good faith and "any other factor indicating that an award of punitive damages would not serve a deterrent function beneficial to society." *Hanover Ins.,* 464 A.2d at 158.

### 1. Reprehensibleness of the Conduct

[¶ 56] The record supports the conclusion that the Stifels used their influence and superior position to virtually imprison an elderly, infirm, and utterly dependent woman; they prevented meaningful contact between her and her loved ones for the apparent purpose of having unencumbered access to her and to her wealth; they used fraud and undue influence to gain access to her assets; and

they caused her to live her remaining days in wretched, inhumane conditions. The Stifels' conduct with respect to Hoch was indeed grossly reprehensible.

### 2. Amount Awarded in Relationship to the Harm and Comparison to Other Cases

[¶ 57] The amount awarded in punitive damages, $3,000,000, though an objectively large amount, is not inappropriate in comparison to the harm, proved to be almost $4,000,000, resulting in a ratio of less than one to one.

[¶ 58] In *Harris,* we affirmed a $1,000,000 punitive damages award—based on the "severe" reprehensible conduct of a landlord which caused both mental distress and property damages to tenants—of a ratio of sixteen to one (comparing the punitive damages award to the actual harm, as measured in compensatory damages). *Harris,* 2000 ME 150, ¶¶ 31–33 n. 21, 756 A.2d at 508–09 (surveying punitive awards in other jurisdictions in which awards as high as 100 to one were upheld).

[¶ 59] In *Shrader–Miller,* we affirmed a ratio of seven to one (a $10,000 punitive damages award and a $1500 compensatory damage award), noting that the defendants' conduct was not as reprehensible as the conduct in *Harris. Shrader–Miller,* 2004 ME 117, ¶ 24, 855 A.2d at 1145–46.

[¶ 60] In this case, the $3,000,000 punitive damages award, in relationship to the compensatory damages award, is not inherently excessive, particularly as compared to other punitive damages awards that we have affirmed.

### 3. Mitigating Factors

[¶ 61] Though not required to do so, we may consider, as but one factor, the financial situation of the defendant for the purpose of assessing whether punitive dam-

ages award bears "such a relationship to the actual wealth of the defendant that the award will serve to deter future behavior inimical to the well-being of society." *Hanover Ins.*, 464 A.2d at 158; *see also Grover v. Minette–Mills, Inc.*, 638 A.2d 712, 718 (Me.1994) ("[T]he law is well established that it is not essential that a plaintiff present evidence of a defendant's financial circumstances before a [fact-finder] may consider an award of punitive damages to the plaintiff").

[¶ 62] In *Shrader–Miller*, very little evidence of the defendants' financial situation was admitted. 2004 ME 117, ¶ 24, 855 A.2d at 1146. We held, however, that the court did not exceed the bounds of its discretion in awarding $10,000 in punitive damages based on facts in the record that the defendants were retired, they owned a residence, and they had sufficient assets to pay for certain construction projects. *Id.* In this case, the record shows that the Stifels own and operate a hotel and spa. We cannot conclude, therefore, that the court abused its discretion in awarding $3,000,000 in punitive damages.

[¶ 63] Finally, we address the state's interest in deterring future conduct. *Hanover Ins.*, 464 A.2d at 158; *see also Harris*, 2000 ME 150, ¶ 31 n. 18, 756 A.2d at 508 (stating that this Court ordinarily also considers the State interest "that a punitive award is designed to serve"); Restatement (Second) of Torts § 908(1) (1977) ("Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future.").

[¶ 64] Although most of the events that support an award of punitive damages, the Stifels' treatment of Hoch, occurred in Germany, Maine has an interest in "expressing society's disapproval of intolerable conduct" toward a woman who, for forty years, lived and worked here, maintained assets here, and sought the benefits and protections of Maine's laws. *Rand v. Bath Iron Works Corp.*, 2003 ME 122, ¶ 15, 832 A.2d 771, 775. Additionally, Maine has an obvious interest in deterring the Stifels, and others, from engaging in such outrageous conduct—an extreme example of elder abuse—in the future. We affirm the punitive damages award.[11]

The entry is:

The compensatory damages award is reduced to $3,746,753.50; in all other respects, the judgment is affirmed.

---

11. While we affirm the punitive damages award, the issue of whether the German courts will enforce the judgment is a separate matter. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 497, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008) (noting that punitive damages are unavailable in Germany and that German courts may decline to enforce foreign punitive judgments as contrary to public policy).